2013 COA 167

ROARING FORK CLUB, LLC,
Petitioner–Appellant,

v.

PITKIN COUNTY BOARD OF EQUAL-IZATION, Respondent–Appellee,

and

Board of Assessment Appeals, State of Colorado, Appellee.

Court of Appeals No. 12CA2008

Colorado Court of Appeals,
Div. IV.

Announced December 5, 2013

Ryley Carlock & Applewhite, F. Brittin Clayton III, Denver, Colorado, for Petitioner–Appellant.

John M. Ely, County Attorney, Laura C. Makar, Assistant County Attorney, Aspen, Colorado, for Respondent–Appellee.

Opinion by JUDGE BERNARD

¶ 1 What is the proper way to determine the actual value of a private, nonequity golf club property for property tax purposes? The answer for the purposes of this appeal involves determining whether the club's sold memberships constitute an interest in land that is subject to assessment.

¶ 2 The Pitkin County Assessor determined the value of a golf club property that is owned by petitioner, the Roaring Fork Club, LLC, for tax year 2011. The Pitkin County Board of Equalization (the BOE), respondent, affirmed this value over the club's objection. The club appealed the BOE's determination to the Board of Assessment Appeals. The Board, after an evidentiary hearing, agreed with the BOE.

¶ 3 The club asserts that the assessor should not have included the value of sold club memberships in the assessment of the club's property for tax year 2011. We agree with the club. We therefore reverse the Board's order, and we remand to the Board for further proceedings. The Board shall determine the actual value of the club's property for 2011 property tax purposes without including the value of the sold memberships.

## I. Background

¶ 4 The club has many amenities. Its property consists of an 18–hole golf course, a driving range, designated golf practice areas, a 28,337–square–foot members' lodge that contains a pro shop, a swimming pool, two tennis courts, fitness facilities, a restaurant, and a bar, another restaurant near the tenth tee, and a 1,381–square–foot members' fishing lodge. The club's property is part of a larger development, and it is surrounded by fifty homes. Because the assessor values the homes separately from the club's property, the value of the homes is not at issue here.

### A. The Club's Funding

¶ 5 The club's property, which is located in the Roaring Fork Valley, is open only to its members, subject to a few minor and irrelevant exceptions. The club's membership agreement, its membership plan, and its rules and regulations, which we cumulatively refer to as the membership agreement, explain the club's and its members' rights and obligations.

¶ 6 A developer finished building the club's amenities in 1999. The club had sold about 82% of the memberships between 1999 and the date the assessor valued it in 2011.

¶ 7 The membership agreement states that members do not receive any property or ownership interest in the club or its property. It also states that a membership *is* "a revocable license" to use the club and its facilities. A membership *is not* "an equity or ownership interest," a "vested or prescriptive right or easement," "an investment" in the club, or an entitlement to "vote or participate" in the club's management, or an interest in the "profits from the [club's] operation." Members are not responsible for the club's liabilities, operating costs, or capital assessments for building or maintaining the club. Members do not have the right to exclude others from using the club's amenities.

¶ 8 Members must pay the club a one-time deposit, annual dues, and an annual minimum fee for dining at the club's restaurants. The club offers three membership levels. All of the fifty homeowners in the development must be "regular" members. There are also "national" and "social" members.

¶ 9 The club's rules cap the number of memberships at 365 regular memberships, 150 national memberships, and 150 social memberships. When the assessor conducted his 2011 valuation, the club had sold 324 regular memberships, 149 national memberships, and 74 social memberships.

¶ 10 Each membership level has different rights to use the club's amenities. Regular members must live in the Roaring Fork Valley, and they are entitled to play unlimited rounds of golf. National members do not live in the Roaring Fork Valley, and they are limited to thirty rounds of golf a year. Social members cannot use the golf course, but they may use the rest of the club's amenities. These rights extend to the members' families and guests.

¶ 11 Members maintain their membership rights for life unless they sell or relinquish their memberships or the club revokes them. The membership agreement states that the club "reserves the right, in its sole discretion, [to] terminate any membership or all memberships" and that the club may terminate the memberships of members who violate the club's rules and regulations. When members

die, their rights are transferred to their surviving spouses.

¶ 12 The amount that members pay is based on their membership level. Regular members who joined the club in 1999 paid a membership deposit of $57,500. In the mid–2000s, new regular members paid a deposit of $225,000, and those who joined in 2011 when the assessor valued the club paid $175,000. In 2011, new national members paid a $100,000 deposit and new social members paid $37,500.

¶ 13 The club uses the membership deposits to improve its property and to maintain these improvements. It also used the deposits to cover its operating expenses until there were enough members paying dues to pay those expenses. The club has generated a profit only in the last few years.

¶ 14 The club treats the cumulative deposits as a liability instead of an asset for accounting purposes because it refunds all or part of members' deposits in two situations. If members maintain their memberships for at least 30 years, or if they resign their memberships earlier and replacement members fill their spots, the club will refund all or part of their deposits, depending upon the conditions in their individual membership agreements. Members do not earn interest on their deposits.

¶ 15 The rules give the club discretion to raise or lower the annual dues and the minimum dining fees each year. As of the date of the assessor's valuation, regular members paid annual dues of $13,000 and dining fees of $1,200. National members paid annual dues and dining fees totaling $7,100. Social members paid $5,000 in annual dues and dining fees.

### B.   Procedural History of this Case

¶ 16 The assessor determined that the actual value of the club's property for tax year 2011 was about $19,000,000. The club asked the BOE to value its property at a lower figure. After the BOE denied this request, the club sought, and received, a de novo hearing before the Board under section 39–9–108(1), C.R.S.2013.

¶ 17 The club asserted at the hearing that the actual value of the club's property for tax year 2011 was about $7,000,000. The club contended, as is pertinent to our analysis, that the value of the sold memberships should not be considered in determining the actual value of the club's property for property tax purposes because the memberships are not interests in the real property.

¶ 18 The BOE replied that the value of these memberships was properly considered as part of the actual value of the club's property. It relied on section 39–1–106, C.R.S.2013, commonly known as "the unit assessment rule," which required the assessor to determine the "full fee simple interest" of the club's property. The memberships, the BOE's argument continued, were part of the club's full fee simple interest in the club's property because they were effectively leasehold interests, and the membership deposits were akin to prepaid rent. According to the BOE, the memberships would improperly escape taxation if they were not included in the actual value of the club's property.

¶ 19 The Board agreed. It decided that the club had not established that the assessor had improperly included the value of the memberships in his property tax assessment for 2011. Citing the unit assessment rule, the Board determined that (1) the club gave its members "effective leasehold interest[s]" when it accepted their deposits; and (2) leasehold interests must be valued as part of the full fee simple interest of the club's property.

### II.   Standard of Review and General Legal Principles

¶ 20 We presume that an assessor's determination of the value of a property is correct. *Arapahoe Cnty. Bd. of Equalization v. Podoll*, 935 P.2d 14, 18 (Colo.1997). The taxpayer must show, by a preponderance of the evidence, that the assessor's valuation is incorrect. *Id.*

¶ 21 When we analyze the Board's orders on appeal, we (1) review questions of law and interpretations of the applicable statutory and constitutional provisions de novo; and (2) apply those interpretations to the

facts duly determined in the proceedings of the Board. §§ 24–4–106(7), (11), C.R.S.2013. It is the Board's function, and not ours, to resolve conflicts in the evidence and to weigh the proof. *Jefferson Cnty. Bd. of Cnty. Comm'rs v. S.T. Spano Greehouses, Inc.*, 155 P.3d 422, 424 (Colo.App.2006). We defer to the Board's factual findings, but we will set aside an order issued by the Board if we conclude that competent evidence does not support the order, or if the order "reflects a failure to abide by the statutory scheme for calculating property tax assessment." *Id.*

¶ 22 The analysis of the statutory scheme is an issue of law that we review de novo. *Id.* We must interpret the statute as a whole in order to give all its parts "consistent, harmonious, and sensible effect." *Id.* We give substantial deference to the valuation methods that the legislature has adopted. *Id.*

¶ 23 We defer to the Board's interpretation of a tax statute if we can reasonably interpret the statute in different ways and if the Board has expertise in the area discussed by the statute. *Id.* at 425.

¶ 24 If the statute does not provide specific guidance about such an issue, then we will consider the Property Tax Administrator's interpretation of the statutory language. *Id.* The administrator provides interpretations of property tax statutes in a manual called the *Assessor's Reference Library.* *Id.* This manual, as is pertinent here, describes the methods of "appraising and valuing land [and] improvements." § 39–2–109(1)(e), C.R.S.2013.

¶ 25 The interpretation of a contract, like the membership agreement, is a question of law that we review de novo. *Ad Two, Inc. v. City & Cnty. of Denver,* 9 P.3d 373, 376 (Colo.2000).

¶ 26 The issue here—whether the sold memberships are an interest in property that can be valued and is subject to property tax—is an issue of law. As we explain in detail below, we must interpret the membership agreement and then determine how that interpretation fits into the requirements of a property tax statute.

### III. The Assessor's Valuation

#### A. Valuation Principles

¶ 27 The Colorado Constitution requires that all real property be taxed unless the legislature has exempted it from taxation. Colo. Const. art. X, § 3(1)(a); § 39–1–102(16), C.R.S.2013 (" 'Taxable property' means all property, real and personal, not expressly exempted from taxation by law."); *Mesa Verde Co. v. Montezuma Cnty. Bd. of Equalization,* 898 P.2d 1, 5 (Colo.1995). The definition of "real property" includes, as is relevant here, "[a]ll lands or interests in lands." § 39–1–102(14), C.R.S.2013.

¶ 28 Colorado Constitution article X, section 3(1)(a), requires that assessors determine the "actual value" of real property. The methods for determining actual value are the "cost approach, market approach, and income approach to appraisal." Colo. Const. art. X, § 3(1)(a); *see also* § 39–1–103(5)(a), C.R.S.2013 (same). The income approach calculates the income stream that the property can generate, which is "capitalized to value at a rate typical within the relevant market." *S.T. Spano Greenhouses, Inc.,* 155 P.3d at 425.

¶ 29 The club and the BOE agree that the income approach is the proper one to use in this case. But they disagree about a particular aspect of the application of the income approach: Should the value of sold memberships be used in the calculation of the actual value of the club's property for property tax purposes?

¶ 30 This question implicates the "unit assessment rule" found in section 39–1–106. This rule requires that "all estates in a unit of real property be assessed together." *City & Cnty. of Denver v. Bd. of Assessment Appeals,* 848 P.2d 355, 359 (Colo.1993). When there are "disparate interests" in one piece of property, such as several leaseholds, "both the lessor's interest and the lessee's interest are assessed simultaneously." *Id.* The assessor taxes the owner of the property "as though [the property] was an unencumbered fee." *Id.* The owner of the fee is then responsible for paying the tax bill for "the real estate as an entirety." *Id.* The owner

then may apportion the tax among the lessees. *Id.*

¶ 31 The BOE does not contend that the sold club memberships are land. The issue we must resolve is whether, as the BOE contends, these memberships are an "interest in land," *see* § 39–1–102(14), such as a leasehold. We begin by recognizing that a leasehold is an interest in land, *see Schneiker v. Gordon,* 732 P.2d 603, 606 (Colo. 1987), but that a license is not, *see Radke v. Union Pac. R.R. Co.,* 138 Colo. 189, 207, 334 P.2d 1077, 1087 (1959).

### B. Description of the Assessor's Valuation Method

¶ 32 The assessor applied the income approach as modified by recommendations contained in a document entitled "APR 230: Valuation of Golf Courses (2008)." The Division of Property Taxation prepared "Valuation of Golf Courses" for a workshop that it conducted to train county assessors. ("Valuation of Golf Courses" is not included in the manuals of the *Assessor's Reference Library*.) A representative from the Division of Property Taxation testified before the Board that the recommendations contained in "Valuation of Golf Courses" came from two professional appraisal and assessment journal articles.

¶ 33 "Valuation of Golf Courses" states that "[t]he income approach to value is based on the economic principle that the value of an income producing property is the present worth of anticipated future benefits." It also states that the income approach involves (1) estimating the total annual gross revenue generated by the property; (2) deducting allowable annualized expenses; and (3) dividing the resulting net operating income by the appropriate capitalization rate.

¶ 34 Up to this point, the BOE and the club seem to agree that "Valuation of Golf Courses" is an uncontroversial summary of the income approach. But it then adds the following recommendation about which the BOE and the club disagree:

> In a non-equity club (nonproprietary club) the facility is owned by someone other than the members. The owner grants certain rights to its use to others who wish to become members. Such rights are often considered licenses, effectively, rental agreements, but do not transfer any long-term ownership rights.
>
> . . . .
>
> The income approach can be used to value [non-equity] golf course[s] by starting with the assumption that there are no members and all memberships are available for sale. A new revenue stream for this club must be estimated. This new revenue stream is composed of the sale of memberships in the "new" club. This "new" annual revenue stream could then be valued using annuity capitalization, with a "sellout" period based on the historical experiences of similar clubs. The cost to market and sell these memberships would have to be estimated and that amount would have to be deducted as a selling expense to establish the net income from the sale of. memberships. The next step is to establish the appropriate discount rate to determine the net present worth of the income from the sales of memberships.

### C. Analysis

¶ 35 The BOE argues that including the value of all sold memberships in the valuation of the club's property is appropriate under the unit assessment rule. It asserts that these memberships are an analytical and functional equivalent of the leaseholds described by the unit assessment rule.

¶ 36 The club replies that the sold memberships are merely licenses, and, therefore, they do not constitute an interest in land. We agree with the club based on the following six conclusions.

¶ 37 *The membership agreement is not a lease.* The agreement expressly states that memberships are not ownership interests or easements. It does not give members "the right of possession of the property leased, and exclusive use or occupation of it for all purposes not prohibited by its terms." *Am. Coin–Meter of Colo. Springs., Inc. v. Poole,* 31 Colo.App. 316, 318, 503 P.2d 626, 627 (1972); *see also Rutherford v. Scarborough,* 28 Colo.App. 352, 355, 472 P.2d 721, 723

(1970) (a lessee is entitled to the full possession of the premises, even to the exclusion of the landlord, and enjoys all the benefits normally derived from the land, except for those expressly reserved by the lessor).

¶ 38 *Memberships are not life estates.* A holder of a life estate is entitled to rents and profits from the property. *Robinson v. Tubbs,* 140 Colo. 471, 474, 344 P.2d 1080, 1081–82 (1959). The membership agreement makes clear that members do not receive any rents or profits from the club's property. A holder of a life estate is entitled to exclusive possession and use of the property. *See Beach v. Beach,* 74 P.3d 1, 3 (Colo. 2003). Members are not entitled to exclusive possession or use of the club's property.

¶ 39 *The agreement does not give members any other taxable interest in the club's property.* The agreement does not transfer any interest in the club's property to the members. *See Bernhardt v. Hemphill,* 878 P.2d 107, 113 (Colo.App.1994) (time-share contract for use of a motel did not create an interest in real property because the contract specifically stated that it did not transfer an interest in land and because the purchasers were not entitled to use any particular unit during any particular period).

¶ 40 Although members are entitled to use the club's amenities, members cannot exclude any others from the club's property who would use it in the same way. Members are not entitled to manage the club or its property. They are not responsible for the club's operating expenses. *See also* Laurence A. Hirsh, *Private Golf Club Memberships: Real or Personal Property?,* 4.3 J. of Prop. Tax Assessment & Admin. 71 (2007) (initiation fees and membership deposits "should not be considered as income attributable to real property.").

¶ 41 *The language of the agreement establishes that memberships are "revocable licenses."* "A license is a personal privilege to do some act or series of acts upon the land of another not involving possession of an estate or interest therein." *Welsch v. Smith,* 113 P.3d 1284, 1289 (Colo.App.2005). Members have a personal privilege to perform any of a series of acts on the club's property,

including playing golf, fishing, dining, or working out at the fitness facility. But the memberships can be revoked for reasons including nonpayment of dues or violation of the club's rules and regulations. *See Radke,* 138 Colo. at 207, 334 P.2d at 1087("A license is merely a permit or a privilege to do what otherwise would be unlawful.... [S]trictly speaking [a license] is not property or a property right[.]").

¶ 42 *The unit assessment rule does not apply to these memberships.* The sold memberships created by the agreement are not "estates in a unit of real property." They are, instead, licenses that do not create an interest in land. *See City & Cnty. of Denver,* 848 P.2d at 359.

¶ 43 *By reaching this last conclusion, we necessarily reject the BOE's argument that the sold memberships are usufructuary interests.* A "usufruct" is generally a "right to enjoy the fruits of another's property without diminishing it, although the property might naturally deteriorate over time." *Black's Law Dictionary* 1580 (8th ed. 2004). Case law has recognized three types of "fruit": "natural profits," such as timber, wool, or milk; "industrial profits," such as crops; and "civil profits," such as rents. *Marshall v. Marshall,* 735 S.W.2d 587, 599 (Tex.Ct.App. 1987).

¶ 44 An example of such a usufructuary right in Colorado is a water right, which gives "its holder the right to use and enjoy the property of another without impairing its substance." *Navajo Dev. Co., Inc. v. Sanderson,* 655 P.2d 1374, 1377 (Colo.1982). The holder of the water right may apply it "beneficially" without destroying it because water is not changed by its use. *Id.* "Unused or waste water will be discharged back into the river system or otherwise recycled," and it will then be available for others to use. *Id.* Another supreme court case described usufructuary rights as rights "for wood, timber, water, and pasture." *See Rael v. Taylor,* 876 P.2d 1210, 1213 (Colo.1994).

¶ 45 The membership agreement in this case does not authorize members to take whatever "fruits," such as timber, water, crops, or rents, that the club's property may generate. The agreement does not award

members income from the club's amenities, and it does not entitle members to a share of its profits. Rather, the agreement states that memberships "are offered only for recreational purposes." Thus, the agreement does not create a usufructuary interest.

## IV. Conclusion

¶ 46 We reverse the Board's order upholding the BOE's valuation of the club's property. We remand this case to the Board to hold a hearing to determine the actual value of the club's property for 2011 property tax purposes. Such a determination shall not include the value of the club's sold memberships. We take no additional position on (1) what the value of the club's property should be; or (2) what other factors the Board may consider in determining that value.

JUDGE WEBB and JUDGE DUNN concur.