Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 8, 2019

**2019 CO 22**

**No. 17SC862, *Hinsdale County v. HDH Partnership*—Taxation—Record Title—
Restrictive Covenants.**

In this property tax case, the supreme court is asked to determine whether the

restrictive covenants and bylaws of a hunting and fishing club render the club the true

"owner" of the club grounds and therefore liable for property taxes, even though the club

members hold record fee title to land parcels that comprise the club grounds.

The supreme court holds that such covenants and bylaws do not render the club

the "owner" of real property for tax purposes. Colorado's property tax scheme reflects

legislative intent to assess property taxes to the record fee owners of real property. The

parcel owners in this case hold record title to their parcels, which they own in fee simple

and can freely sell. They purchased their parcels with notice of, and subject to, the club's

restrictive covenants and bylaws, which they can vote to amend or repeal. Because the

parcel owners voluntarily agreed to the restrictive covenants and bylaws that facilitate

the collective use of their property for recreational purposes, the court holds that they

cannot rely on these same restrictive covenants and bylaws to avoid property tax liability

that flows from their record title ownership. The court therefore reverses the judgment

of the court of appeals and reinstates the Board of Assessment Appeals' order upholding the assessment of property taxes to each of the record title owners.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

## 2019 CO 22

---

**Supreme Court Case No. 17SC862**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 16CA1723

---

### Petitioners:

Hinsdale County Board of Equalization and Board of Assessment Appeals, State of Colorado.

v.

### Respondents:

HDH Partnership; Lawrence Ausherman; Hondros Family Real Estate, LLC; Mark L. Ish; Herb Marchman; and Teresa M. Mull Revocable Trust.

---

### Judgment Reversed
*en banc*
April 8, 2019

---

**Attorneys for Petitioner Hinsdale County Board of Equalization:**
Schumacher & O'Loughlin, LLC
Michael P. O'Loughlin
*Gunnison, Colorado*

**Attorneys for Petitioner Board of Assessment Appeals:**
Philip J. Weiser, Attorney General
Krista M. Maher, Assistant Attorney General
Grant T. Sullivan, Assistant Solicitor General
*Denver, Colorado*

**Attorneys for Respondents:**
Hoskin Farina & Kampf
Michael J. Russell
Andrew H. Teske
Karoline M. Henning
*Grand Junction, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.

**JUSTICE GABRIEL** concurs in the judgment, and **JUSTICE HOOD** joins in the concurrence in the judgment.

¶1    The Lake Fork Hunting and Fishing Club (the Club) in Hinsdale County, Colorado, consists of 1,400 acres divided into twenty-nine parcels called "Ranches" that are owned in fee simple.  Each owner holding a deed to a Ranch becomes a member of the Club and is subject to a host of restrictive covenants and bylaws through which the Club exercises significant control over the property.  The question before us is whether the restrictive covenants and bylaws render the Club the true "owner" of the Ranch parcels and therefore liable for property taxes, even though the Ranch owners hold record title to those parcels.  The answer is no.

¶2    Respondents are four Ranch owners who, with notice of the Club's restrictive covenants and bylaws, purchased deeds conferring record title to their respective Ranches.   In 2015, the Hinsdale County Assessor conducted valuations of the Respondents' Ranches and assessed property taxes to their parcels.  Respondents protested these valuations and assessments to the Hinsdale County Board of Equalization (the BOE), which denied their petitions.   Respondents then appealed the BOE's determination to the Board of Assessment Appeals (the BAA), arguing that because of the Club's restrictive covenants and bylaws, the Club is the true owner of those parcels and should be held responsible for real property taxes.   The BAA denied the Respondents' appeal and affirmed the Assessor's valuation of the Ranch parcels.

¶3    The Ranch owners then appealed the BAA's decision to the court of appeals, which reversed the BAA's order.  *HDH P'ship v. Hinsdale Cty. Bd. of Equalization*, 2017 COA 134, ¶¶ 3, 51, ___ P.3d ___. The court of appeals looked beyond the Ranch owners' record title and examined the Club's restrictive covenants and bylaws.  Given the extent

of the Club's control over the property, the court concluded that the Club is the true owner of the parcels for purposes of property taxation and viewed the Ranch owners' interests as akin to mere licenses to conduct certain activities on the Club's property. *Id.* at ¶¶ 24–26.

¶4    We granted certiorari review,[1] and now reverse the judgment of the court of appeals. Colorado's property tax scheme reflects legislative intent to assess property taxes to the record fee owners of real property. The Respondents in this case hold record title to their Ranch parcels, which they own in fee simple and can freely sell. They purchased their Ranch parcels with notice of, and subject to, the Club's restrictive covenants and bylaws, which they can vote to amend or repeal. Because Respondents voluntarily agreed to the restrictive covenants and bylaws that facilitate the collective use of their property for recreational purposes, we hold that they cannot rely on these same

---

[1] The BOE and BAA each filed petitions for certiorari review, presenting similar questions. We granted certiorari review of the BOE's petition on the following issue:

1. Whether the court of appeals erred in determining that the homeowners association that manages a subdivision, rather than the fee title owners of the subdivision parcels, is subject to real property taxation due to the covenants that permit the association to restrict property access for nonpayment of association assessments.

We also granted certiorari review of the BAA's petition on the following issue:

2. Whether the court of appeals erred in deciding that record title owners of real property are not the true owners of the property and are therefore not responsible for property taxes, and that, instead, an entity that enforces covenants on the property is the true owner.

restrictive covenants and bylaws to avoid property tax liability that flows from their record title ownership. Accordingly, the court of appeals erred in relying on the Club's restrictive covenants and bylaws to conclude that the Club is the "owner" of the Ranch parcels and that the Ranch owners hold mere licenses to use Club grounds. The court further erred in holding that the Assessor therefore improperly valued the Respondents' parcels.

## I. Facts and Procedural History

¶5 The Lake Fork Hunting and Fishing Club sits on 1,400 acres in Hinsdale County, Colorado. The Club was established in 1979 when the original developer recorded a "Declaration and Establishment of Covenants, Conditions, Reservations, and Restrictions for Lake Fork Hunting and Fishing Club" and subdivided the land.

¶6 The Club property is divided into twenty-nine parcels, or Ranches, that range in size from 35 to 155 acres. The Ranches are owned in fee simple; Ranch owners may freely sell their Ranch parcels and keep the proceeds. Each owner holding a deed to a Ranch becomes a member of the Club. Club membership follows record title to a Ranch and cannot be separately sold, assigned, or transferred, except for one "floating membership"[2] created by the Club's bylaws that is not attached to a Ranch.

---

[2] The "floating membership" is not at issue in this case.

¶7     Club members in good standing can seek election to a three-member Board of Governors that manages the Club's affairs, including its grounds, cabins, funds, and the election of Club officers.

¶8     Through restrictive covenants, bylaws, and rules, the Club exercises significant control over the property.   Notably, the Declaration provides that the Club reserves for the enjoyment and benefit of Club members "exclusive hunting and fishing rights and privileges, including all rights of ingress and egress upon and across the entire property, including all Ranches."  This reservation allows all Ranch owners to hunt, fish, and camp throughout the entire 1,400 acres without regard to Ranch property lines.  In a similar vein, the Club reserves the exclusive right to construct and maintain utilities, roads, lakes, ditches, bridges, and fences; pasture livestock on the entire property, including individual Ranches; impound, store, and divert waters of the Lake Fork of the Gunnison River across the Ranches for the benefit of Club members; and maintain easements necessary to upkeep the Club's skeet and trap field, golf driving range, and airport runway.  The Declaration also imposes several restrictions on the Ranch parcels.  For example, Ranches cannot be conveyed in smaller lots or subdivided; no trailers or mobile homes are permitted on the property without written permission of the Board of Governors; and no part of the property can be used for mining or drilling activities.

¶9     The Club's bylaws and rules further regulate use of the Club grounds (defined as Club property and all Ranches).  Among other things, these bylaws and rules limit the number of guests a member may invite to the Club for hunting and fishing, and the number of days a guest may hunt or fish.  Members must register themselves and their

6

guests when using the Club grounds. Only "members in good standing" are entitled to the Club's privileges. And the Board of Governors can suspend the privileges of a member who violates the Club's regulations or "for any conduct which in the opinion of the Board, is improper or prejudicial to the welfare of or reputation of the Club."

¶10 Importantly, although the Ranch owners take their parcels subject to the Club's covenants and bylaws, they can vote to amend or repeal those covenants and bylaws, or even terminate the Declaration in its entirety. As an example of the Ranch owners' self-governance, a supermajority of Ranch owners voted in 1999 to amend the Declaration to prohibit the construction of any residences on an individual Ranch.

¶11 Respondents HDH Partnership, Lawrence Ausherman, Mark L. Ish, Herb Marchman, Hondros Family Real Estate, LLC, and Teresa M. Mull Revocable Trust (collectively, Respondents) own Ranches in the Club.[3] The Respondents purchased their Ranches via general warranty or quitclaim deeds and hold record title to their Ranches. It is undisputed that Respondents had notice of the restrictive covenants when they purchased their respective parcels.

¶12 In 2015, the Hinsdale County Assessor conducted new valuations of the Ranch parcels and assessed property taxes to the Ranch owners. Respondents protested the

---

[3] Respondent HDH Partnership owns one Ranch parcel; Respondents Ausherman, Ish, and Marchman collectively own one Ranch parcel; Hondros Family Real Estate, LLC owns a 1/3 interest in each of three Ranch parcels; and Respondent Teresa M. Mull Revocable Trust owns a 1/3 interest in one Ranch parcel.

7

valuations and assessments to the BOE, which denied Respondents' petitions. Respondents appealed the BOE's decision to the BAA, arguing that although they hold record title to the Ranches, they do not actually enjoy the traditional incidents of ownership, which instead are retained by the Club. Therefore, Respondents contended, the Club should be considered the "owner" of those parcels for purposes of property taxation.

¶13 The BAA rejected Respondents' arguments. It observed that Respondents obtained interests in their Ranches through deeds transferring real property, and that as holders of those deeds, Respondents had the unrestricted right to sell their Ranch parcels and keep the proceeds. The BAA also observed that Ranch owners enjoy other quintessential incidents of ownership, such as the right to possess and use the entire 1,400-acre Club grounds (including to hunt and fish), and the right to exclude non-members from Club grounds. Indeed, it found that the use of the entire Club grounds is a benefit that Respondents purposefully bargained for when purchasing property rights within the Club's grounds. The BAA thus viewed the Club's restrictions as the Ranch owners' exercise of their liberties and self-governance, finding that the restrictions "are entirely self-imposed as they can be amended or terminated at any time by the majority vote of the Ranch owners." Finally, it rejected Respondents' attempt to classify their property rights as mere licenses or timeshares, reasoning that Respondents can sell, transfer, or dispose of their parcels as they see fit, and that their access to Club grounds is not time-limited.

8

¶14 Respondents appealed the BAA's decision to the court of appeals, which reversed the BAA's order. *HDH P'ship*, ¶¶ 3, 51. The court first concluded that record title is not determinative of property ownership. *Id.* at ¶¶ 16–17. It reasoned that, although section 39-5-102(1), C.R.S. (2018), directs assessors to ascertain ownership "from the records of the county clerk and recorder," such records are merely "prima facie evidence of all things appearing therein." *Id.* at ¶ 16 (citing § 39-1-115, C.R.S. (2018)). Because "prima facie" means "[a]t first sight; on first appearance but subject to further evidence or information," *see prima facie, Black's Law Dictionary* (10th ed. 2014), and because section 39-5-122(2), C.R.S. (2018), allows a person who believes property has been erroneously assessed to him or her to "appear before the assessor and object," the court concluded that record title "merely creates a rebuttable presumption" of ownership. *HDH P'ship*, ¶¶ 16–17.

¶15 The court then decided it was required to look beyond "form," or record title, and examine the "substance" of Respondents' and the Club's rights to determine who should be held responsible for taxes. *See id.* at ¶¶ 18–27. It concluded that, because the Club has a high degree of control over the grounds, and because Respondents may only use the grounds subject to the Club's control and regulation, the Club is the true owner of the parcels (and therefore liable for property taxes), while Respondents' fee title interests are akin to mere licenses. *See id.* at ¶¶ 21–27.

¶16 The court also summarily rejected the BOE's contention that the Colorado Common Interest Ownership Act (CCIOA) required the Assessor to assess the parcels individually, reasoning that section 38-33.3-105(2), C.R.S. (2018), applies only to common

9

interest communities created after June 30, 1992, unless they have elected CCIOA treatment. *Id.* at ¶ 39 (citing §§ 38-33.3-115, -117, -118, C.R.S. (2018)). The court noted that the Club was created in 1979 and has not elected CCIOA treatment. *Id.*

¶17 Finally, based on its conclusion that the Club is the true property owner and that Respondents hold only licenses to use Club grounds, the court held that the Assessor improperly valued the parcels. *Id.* at ¶ 46.

¶18 We granted the BOE's and the BAA's petitions for a writ of certiorari to review the court of appeals' decision. We now reverse the judgment of the court of appeals and reinstate the BAA's order.

## II. Standard of Review

¶19 A taxpayer who challenges an assessment bears the burden to prove, by a preponderance of the evidence, that the assessor's valuation is incorrect. *Cantina Grill, JV v. City & Cty. of Denver Bd. of Equalization*, 2015 CO 15, ¶ 15, 344 P.3d 870, 876. An appellate court may set aside an order of the BAA only if it finds an abuse of discretion, or that the order was arbitrary and capricious, based upon clearly erroneous factual findings, unsupported by substantial evidence in the record, or otherwise contrary to law. *See* § 24-4-106(7), C.R.S. (2018); *Boulder Cty. Bd. of Comm'rs v. HealthSouth Corp.*, 246 P.3d 948, 951 (Colo. 2011). We review questions of law and statutory interpretation de novo. *Boulder Cty.*, 246 P.3d at 951.

## III. Analysis

¶20 Petitioners argue that the court of appeals erred in holding that the Club is the true owner of the Ranches for purposes of property tax liability, and in holding that

10

Respondents, who are the record title owners of the Ranches, possess mere licenses to use Club grounds. We agree.

¶21 We begin by discussing how the relevant statutory tax scheme reflects the legislature's intent to assess property taxes to the record title owners of real property. We explain why the cases relied on by the court of appeals are inapplicable here. We then discuss why the restrictive covenants and bylaws here do not strip Respondents of their ownership interest in their respective parcels and note the policy implications of the court of appeals' ruling to the contrary.

## A. Tax Statutes Reflect Legislative Intent to Hold Record Title Owners Accountable for Property Taxes

¶22 Colorado's tax statutes reflect the legislature's intent to levy property tax on the record fee owner of real property. To begin, section 39-5-104, C.R.S. (2018) requires county assessors to appraise and value "each tract or parcel of land" separately. The assessor must then mail a notice of valuation to "each person who owns land." § 39-5-121(1)(a)(I), C.R.S. (2018). Section 39-5-102(1), in turn, provides that "[o]wnership of real property shall be ascertained by the assessor from the records of the county clerk and recorder." Importantly, this provision does not authorize the assessor to mail a notice of valuation to a party that does not hold record ownership. By their plain language, these statutes provide that assessors must value and tax separate parcels of real property and assess taxes on the parcel owner as determined by the county's real property records.

11

¶23 The court of appeals' decision in *Traer Creek-EXWMT LLC v. Eagle County Board of Equalization*, 2017 COA 16, 401 P.3d 569, comports with our reading of the property tax scheme. In that case, the court of appeals affirmed the dismissal of a commercial lessee's challenge to a property tax valuation. *Traer Creek*, ¶ 1, 401 P.3d at 571. Traer Creek was contractually obligated to pay property taxes for a parcel it leased; however, the owner typically paid the property taxes and Traer Creek reimbursed the owner. *Id.* at ¶ 2, 401 P.3d at 571. After the owner received a notice of valuation regarding the parcel, Traer Creek initiated a protest to challenge it, arguing that it had standing because it "owned" an interest in property, albeit a leasehold interest. *Id.* at ¶¶ 3, 10, 401 P.3d at 571–72.

¶24 The court of appeals rejected Traer Creek's argument, explaining that "[w]hen the valuation in question concerns the fee interest in real property, the statutory phrase 'owns land' is most naturally understood as referring to a fee owner, not someone with a mere leasehold interest in property." *Id.* at ¶ 11, 401 P.3d at 572 (quoting § 39-5-121(1)(a)(I)). The division reasoned that section 39-5-102(1) confirms this understanding of ownership because it provides that "[o]wnership of real property shall be ascertained by the assessor from the records of the county clerk and recorder." *Id.* at ¶ 12, 401 P.3d at 572. Such records, the division noted, "typically identify fee owners." *Id.* And "only fee owners of real property are liable to the taxing authority for taxes assessed pursuant to a valuation of real property." *Id.* (emphasis omitted). The division also observed that it is the record fee owners who receive notice of, and have the authority to challenge, the valuation of their real property. *Id.* at ¶¶ 13–16, 401 P.3d at 572–73 (citing §§ 39-5-121(1)(a), -122; §§ 39-8-106, -108, C.R.S. (2018)). Thus, "the fee owner is the only party given statutory

12

standing to object to and protest the assessor's valuation of real property in fee." *Id.* at ¶ 15, 401 P.3d at 572.

¶25 As the *Traer Creek* division recognized, property tax valuation and assessment in Colorado is premised on the notion that the party holding record title to the property is the fee owner responsible for property taxes. *See id.*; *see also* § 39-5-102(1). Even where there are multiple interests in a specific property (such as Traer Creek's leasehold interest), the "unit assessment rule" requires all estates in a parcel of real property to be assessed together, and taxes are assessed to the record fee owner as though it was an unencumbered fee. *Cantina Grill*, ¶ 20, 344 P.3d at 877; *City & Cty. of Denver v. Bd. of Assessment Appeals*, 848 P.2d 355, 358 (Colo. 1993); *see also* § 39-1-106, C.R.S. (2018) ("For purposes of property taxation, it shall make no difference that the use, possession, or ownership of any taxable property is qualified, limited, not the subject of alienation, or the subject of levy or distraint separately from the particular tax derivable therefrom."). The responsibility of apportioning the tax among various interest holders rests with the private parties who own those interests, and can be resolved as a contractual matter between landlord and tenant. *City & Cty. of Denver*, 848 P.2d at 359–60. Notably, this approach avoids the "administrative nightmare" of requiring an assessor to look beyond record title to examine the terms of leases to allocate multiple interests in the taxable property. *Id.*

## B. Cases That Look Beyond "Forms and Labels" In Other Contexts Are Inapposite Here

¶26    The court of appeals did not reference *Traer Creek*. Instead, it reasoned that the records of the county clerk and recorder are merely "prima facie evidence of all things appearing therein," and therefore, record title "merely creates a rebuttable presumption [of property ownership], not a conclusive determination," *HDH P'ship*, ¶ 16 (citing § 39-1-115). Relying on a handful of cases, the court then concluded that it must look beyond "form[s] and labels" to determine "real ownership." *Id.* at ¶¶ 18–20 (citing *Cantina Grill*, 2015 CO 15, 344 P.3d 870; *Mesa Verde Co. v. Bd. of Cty. Comm'rs*, 495 P.2d 229 (Colo. 1972); *City of Golden v. Aramark Educ. Servs., LLC*, 2013 COA 45, 310 P.3d 262; *Bernhardt v. Hemphill*, 878 P.2d 107 (Colo. App. 1994); *Gunnison Cty. v. Bd. of Assessment Appeals*, 693 P.2d 400 (Colo. App. 1984); *Vill. at Treehouse, Inc. v. Prop. Tax Adm'r*, 2014 COA 6, 321 P.3d 624). But the court mistakenly relied on these cases to conclude that it was required to look beyond record fee title to determine who is the true "owner" of the Ranches in this case.

¶27    The substance-over-form doctrine is one of a group of judicially created anti-abuse doctrines that have developed in federal tax jurisprudence over the last century. Courts have applied the doctrine along with other, closely related (and often overlapping) doctrines such as the business purpose, economic substance, sham transaction, and step transaction to break abusive tax shelters. *See* Joseph Bankman, *The Economic Substance Doctrine*, 74 S. Cal. L. Rev. 5, 7 (2000); *see also* Linda D. Jellum, *Codifying and "Miscodifying" Judicial Anti-Abuse Tax Doctrines*, 35 Va. Tax Rev. 579, 590–91 (2014). Courts use these

doctrines to call out questionable transactions undertaken to minimize or avoid income tax by requiring a transaction to comply with the underlying purpose of a tax statute and not just its language.[4] Jellum, *supra*, at 590. But the substance-over-form doctrine is inapplicable here.

¶28 The passage quoted by the court of appeals from *City of Golden* observed that courts have "refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred." *HDH P'ship*, ¶ 18 (quoting *City of Golden*, ¶ 31, 310 P.3d at 269). This passage from *City of Golden* was lifted from the U.S. Supreme Court's decision in *Frank Lyon Co. v. United States*, which noted that in applying the substance-over-form doctrine "the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." 435 U.S. 561, 572–73 (1978). But there is no questionable transaction here shifting formal legal title to minimize or avoid taxation. The Club did not, for example, transfer fee title in the parcels to the Ranch owners but then retain such significant incidents of ownership that it would be unfair or inequitable to transfer the tax burden to the Ranch owners and not to tax the Club.

---

[4] Consequently, these common law doctrines are the subject of some debate because they represent a decidedly nontextual approach to the interpretation of tax statutes. Jellum, *supra*, at 589–90; *see also* Bankman, *supra*, at 5.

¶29    This court's decisions in *Mesa Verde* and *Cantina Grill* likewise do not support the court of appeals' approach here. Both of those cases concerned a unique application of the unit assessment rule allowing assessment of property taxes to private concessioners operating businesses on otherwise tax-exempt, government-owned land. *Mesa Verde*, 495 P.2d at 231–32; *Cantina Grill*, ¶¶ 1–4, 20–22, 344 P.3d at 873–74, 877. As we explained in *Cantina Grill*, where the fee owner of real property is the government and therefore not subject to taxation, the unit assessment rule permits taxation of the private possessory interest in the land and improvements, given the absence of a fee owner who pays the full taxes. *Cantina Grill*, ¶ 21, 344 P.3d at 877 (citing *Bd. of Cty. Comm'rs v. Vail Assocs., Inc.*, 19 P.3d 1263, 1279 (Colo. 2001)); *see also* § 39-1-107(4), C.R.S. (2018) ("The property tax on a possessory interest in real or personal property that is exempt from taxation under this article shall be assessed to the holder of the possessory interest and collected in the same manner as property taxes assessed to owners of real or personal property.").

¶30    In *Mesa Verde*, we examined whether, for ad valorem tax purposes, the concessioner was the "owner" of improvements it had built in Mesa Verde National Park to carry on its service business to the public. 495 P.2d at 231. We noted that although the United States held legal title to the improvements, the parties' contract gave the concessioner a "possessory interest in all concessioner's improvements consisting of all incidents of ownership," including the right to sell, transfer, assign, encumber, or mortgage its possessory interest, and to operate the properties for private profit. *Id.* at 232–33. We reasoned that because the concessioner possessed "the most significant incidents of ownership," it would be "especially unjust" to allow the concessioner to

16

"escape state taxation merely because the United States held legal title." *Id.* at 233. In other words, we looked beyond legal title in *Mesa Verde* to ensure that a private party's possessory interests in otherwise tax-exempt government property did not escape taxation.

¶31 More recently, in *Cantina Grill*, we addressed taxation of concessioners' private possessory interests in tax-exempt city-owned airport land. ¶ 1, 344 P.3d at 873–74. As with *Mesa Verde*, we looked beyond the government's legal title to examine the nature of the concessioners' possessory interests because the tax-exempt status of the government fee owner meant that ordinary application of the unit assessment rule would not capture those possessory interests. *Id.* at ¶¶ 22, 29–31, 344 P.3d at 877, 879.

¶32 In short, we looked beyond title in *Mesa Verde* and *Cantina Grill* to assess taxable private possessory interests in otherwise tax-exempt land. But those cases do not mandate a substance-over-form approach in the ordinary fee title ownership situation here, particularly in the absence of a transaction or arrangement undertaken to minimize or avoid taxation.

¶33 The court of appeals' decision in *Gunnison County* concerned both the tax-exempt nature of government property and a transaction. There, Gunnison County needed to renovate its courthouse and jail facilities. *Gunnison Cty.*, 693 P.2d at 402. To enable those repairs, the county entered into a lease-purchase agreement under which it conveyed title to its courthouse and jail to a private party who funded improvements to those facilities; the county then leased the property back under renewable one-year leases with an option to purchase for a nominal amount at the end of the lease. *Id.* When the county assessor

17

assessed property taxes against the courthouse and jail, the county paid the taxes pursuant to its lease but then petitioned for an abatement or refund, arguing that the courthouse and jail were county property and therefore tax-exempt. *Id.*

¶34 Citing *Mesa Verde*, the court of appeals looked beyond record title and concluded that the county had retained sufficient control of the property to render it tax-exempt, reasoning that it occupied and controlled the property, controlled construction and improvements on the property, maintained and insured the property, and held an option to purchase the property for a nominal amount at the end of the lease. *Gunnison Cty.*, 693 P.2d at 404 (citing Colo. Const. art. X, § 4). Although the record title holder in *Gunnison County* ultimately was not liable for property taxes, the court of appeals' application of the substance-over-form doctrine focused on a transaction that nominally shifted title from the county to a private party. Moreover, the outcome there must be understood in the same general context as *Mesa Verde* and *Cantina Grill*. Given the circumstances of the lease-purchase arrangement, including that the property remained occupied and used by the tax-exempt county that originally owned the property, the division understandably upheld the trial court's determination that the property came within the public property tax exemption under article X, section 4 of the Colorado Constitution. *Id.*

¶35 The other cases relied on by the court of appeals are also inapplicable.

¶36 In *Village at Treehouse*, the court of appeals held that development rights to build condominium units purchased from a homeowners' association constituted a taxable real property interest for ad valorem tax purposes, even though the transferor association retained rights in the common elements. ¶¶ 8–18, 321 P.3d at 624, 626–27. But *Village at*

18

*Treehouse* did not clearly follow a substance-over-form principle. *See id.* at ¶ 16, 321 P.3d at 627. In fact, that decision is consistent with the "record title" approach because the conveyance of the development right there was recorded. *Id.* And in any event, *Village at Treehouse* aligns with the notion of imputing tax liability to all interests in real property, unless lawfully exempted. *See* § 39-1-102(16), C.R.S. (2018) ("'Taxable property' means all property, real and personal, not expressly exempted from taxation by law.").

¶37 Finally, in *Bernhardt*, the court of appeals held that a timeshare contract did not create a real property interest. 878 P.2d at 113. But *Bernhardt* is inapposite because it involved a claim to contractual timeshare rights in a motel, not the taxability of a property owner's fee interest in land. *Id.* at 111–13.

¶38 In sum, the court of appeals mistakenly relied on these cases to conclude that it was required to look beyond record fee title to determine who is the true "owner" of the Ranches. The-substance-over-form doctrine is inapplicable here; as noted above, this case does not concern a questionable transaction taken to minimize or avoid taxation or otherwise improperly shift tax liability to the Ranch owners. Certainly, the cases relied on by the court of appeals do not suggest that a record fee owner of real property may not be the true "owner" for property tax purposes merely because restrictive covenants and bylaws limit certain aspects of the owner's fee interest.

### C. The Restrictive Covenants and Bylaws Did Not Strip Respondents of Fee Ownership of the Ranches or Their Property Tax Liability

¶39 After determining that it was required to look beyond fee title to determine the "real ownership" of the Ranch parcels, the court of appeals examined the restrictive

covenants on the Ranch parcels to conclude that the Club is the true owner for property tax purposes, and that the Ranch owners' rights amount to "mere license to use Club Property, not fee ownership." *HDH P'ship*, ¶¶ 21–30. We disagree with the court's reasoning and conclusion.

¶40 The court of appeals observed that the Club exerts a high degree of control over the Club grounds through restrictive covenants and bylaws, and that the Ranch owners may only use the grounds subject to the Club's regulation. *Id.* at ¶ 21. Given the extent of the Club's control, the court concluded that the Club enjoys most of the traditional benefits of real property ownership. *Id.* at ¶¶ 25–26.

¶41 The court then likened the Ranch owners' rights to mere licenses, relying on another division's reasoning in *Roaring Fork Club, LLC v. Pitkin County Board of Equalization*, 2013 COA 167, 342 P.3d 467. There, the question was whether a private golf club's sold membership constituted an interest in land akin to a leasehold subject to property tax under the unit assessment rule. *Roaring Fork*, ¶¶ 1, 35, 342 P.3d at 468, 472. Roaring Fork Club members had "a personal privilege to perform any of a series of acts on the club's property, including playing golf, fishing, dining, or working out at the fitness facility." *Id.* at ¶ 41, 342 P.3d at 473. But members had no right to possession, could not receive rents or profits from the club's property, and could not "exclude any others from the club's property who would use it in the same way." *Id.* at ¶¶ 38, 40, 342 P.3d at 472–73. Furthermore, memberships could be revoked for non-payment of dues or violation of club rules. *Id.* at ¶ 41, 342 P.3d at 473. The *Roaring Fork* division ultimately

20

concluded that the memberships were merely licenses, and not taxable real property interests in land. *Id.* at ¶¶ 36–42, 342 P.3d at 472–73.

¶42    Here, equating the Ranch owners' fee title ownership with the benefits of the golf club's membership in *Roaring Fork*, the court of appeals concluded that the Ranch owners' rights are akin to holding a mere license because the Club "enjoys most of the traditional benefits of real property ownership." *HDH P'ship*, ¶¶ 21, 25–26, 30.

¶43    The court of appeals' reliance on *Roaring Fork* was misplaced. First, *Roaring Fork* did not concern a substance-over-form analysis vis-à-vis record fee title. Second, as the division in *Roaring Fork* noted, a license is not an ownership interest in land. ¶ 31, 342 P.3d at 472; *compare Union Pac. R.R. Co.,* 334 P.2d 1077, 1087 (Colo. 1959) ("[S]trictly speaking [a license] is not property or a property right, nor does it create a vested right."), *with Title, Black's Law Dictionary* (10th ed. 2014) (defining title as "[t]he union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property; the legal link between a person who owns property and the property itself"). Third, the membership agreement at issue in *Roaring Fork* is wholly unlike the record fee ownership of the Ranch parcels held by Respondents here. The golf club membership agreement in *Roaring Fork* stated that it was "a revocable license" to use the club and its facilities, and *not* "an equity or ownership interest" in the property. ¶ 7, 342 P.3d at 469. It made clear that members did not receive any property or ownership interest in the club or its property, and that membership in the club did not convey an entitlement to "vote or participate" in the club's management. *Id.*

21

¶44     Respondents' fee interests in this case are not mere licenses.  The Ranch owners purchased their Ranches via general warranty or quitclaim deeds and hold record title to their ranch parcels in fee simple.  In short, Respondents hold vested property rights in land.  Even under the restrictive covenants and bylaws, the Club cannot revoke their rights in fee simple or inhibit their ability to sell their parcels and retain the proceeds.

¶45     And in any event, as recognized by the BAA, the restrictions on the Ranch owners' use of the property are self-imposed.  Indeed, these restrictive covenants and bylaws purposefully facilitate the Ranch owners' collective use of their Ranch properties for hunting, fishing, and other recreational purposes.  It is undisputed that Respondents had notice of the restrictive covenants when they purchased their respective parcels.  It is also undisputed that the Ranch owners may vote to amend or repeal the restrictive covenants and bylaws or even terminate the Declaration. Moreover, Club members in good standing may run for seats on the Board of Governors, and may vote for and remove Board members, and thus have a say in management of the Club.  If anything, the record before us indicates that Ranch owners have chosen to ensure the collective recreational use of their hunting and fishing grounds by voting to amend the Declaration to prohibit the construction of a residence on any individual Ranch.  In short, by purchasing deeds to their Ranch parcels with notice of the restrictive covenants and bylaws, Respondents got what they bargained for, and we hold that they cannot rely on these same restrictive

covenants and bylaws to avoid property tax liability that flows from their record title ownership.[5]

¶46 Finally, by holding that the determination of ownership of real property requires looking beyond legal title to the nature of restrictive covenants or other encumbrances that run with the land, we note that the court of appeals' approach could have unintended consequences for real property owners, county assessors, title insurers, and homeowners' associations because it injects uncertainty into who "owns" taxable real property in Colorado. The opinion below could significantly burden county assessors, who often have limited resources. The uncertainty of ownership may also create problems for title insurers to assess risks. Finally, homeowners' associations and similar entities that enforce restrictive covenants could face uncertainties about whether they have crossed the line into the role of "true ownership" of property for tax purposes. These policy implications further convince us not to apply a substance-over-form approach to the facts of this case.

¶47 In sum, we hold the court of appeals erred in concluding that the Club is the "owner" of the Ranch parcels and that the Ranch owners' rights amount to mere license

---

[5] Respondents also claim that the "floating membership" demonstrates the irrelevance of the record title form. They argue that the floating membership enjoys "exactly the same rights," even though such membership holds no title to the land. We are unpersuaded. The single floating membership—unlike deed ownership—is a contractual right to use Club grounds created by the Club's bylaws. In contrast to Ranch ownership, Club members can vote to terminate the floating membership by amending the bylaws.

to use Club property, not fee ownership, and in concluding that the Assessor therefore improperly valued the Ranch parcels.

## D. Colorado Common Interest Ownership Act

¶48 The court of appeals held that CCIOA section 38-33.3-105(2), which governs taxation of common interest community properties, applies to common interest communities created only after June 30, 1992, unless they have elected CCIOA treatment. *HDH P'ship*, ¶ 39. Since the Club was created in 1979, the court concluded that section 38-33.3-105(2) was inapplicable to its analysis. *Id.*

¶49 However, section 38-33.3-117(1)(c), C.R.S. (2018), titled "Applicability to preexisting common interest communities," lists CCIOA section 38-33.3-105 as applying to "all common interest communities created within this state *before* July 1, 1992, with respect to events and circumstances occurring on or after July 1, 1992." (Emphasis added.) We agree with the parties that the court of appeals erred in holding that CCIOA section 38-33.3-105(2) applies to common interest communities created only after June 30, 1992. But because we have already concluded that individual Ranch owners—not the Club— are subject to taxation, we need not decide whether CCIOA otherwise applies to the Club parcels.

## IV. Conclusion

¶50 For the foregoing reasons, we reverse the judgment of the court of appeals and reinstate the BAA's order.

**JUSTICE GABRIEL** concurs in the judgment, and **JUSTICE HOOD** joins in the concurrence in the judgment.

24

JUSTICE GABRIEL, concurring in the judgment.

¶51 Although I agree with much of the majority's analysis in this case, as well as with the result that it reaches, for two reasons, I cannot subscribe to the majority's discussion in Part III(B) of its opinion of the cases that look beyond "forms and labels" to determine actual property ownership.

¶52 First, I am not persuaded that the doctrine is necessarily limited to cases involving "questionable transaction[s]" taken to minimize or avoid taxation, maj. op. ¶ 38, or in which private concessioners operate businesses on otherwise tax-exempt, government-owned land, and I fear the unintended consequences of what I believe may be an overly broad limitation.

¶53 Second and perhaps more important, in my view, the majority's discussion of this issue is unnecessary. The conclusion that the majority reaches in this case is amply supported by the fact that Respondents took record title voluntarily and with knowledge of the restrictive covenants and bylaws on which they now seek to rely to disclaim ownership. In these circumstances, I would adhere to the "cardinal principle of judicial restraint" of which then-Judge and now-Chief Justice John Roberts has reminded us: "[I]f it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

¶54 For these reasons, I respectfully concur in the judgment only.

I am authorized to state that JUSTICE HOOD joins in this concurrence.

1