Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
February 22, 2022

**2022 CO 9**

**No. 20SC852,** *Lodge Properties, Inc., and Board of Assessment Appeals v. Eagle County Board of Assessment Appeals* — **Taxation** — **Real Property.**

In this case involving the valuation for real property tax purposes of a luxury resort property that includes a hotel, privately owned condominiums, and amenities, the supreme court considers whether the net income generated from fees paid by the condominium owners to a third-party company that manages the rental of their condominiums to overnight guests should be included in the resort's actual value under the income approach to valuation.

The court now concludes that the net income generated from rentals of the individually and separately owned condominium units was not income generated by the resort and therefore should not have been included in the resort's actual value under the income approach to valuation.

Accordingly, the court reverses the judgment of the division below.

**2022 CO 9**

**Supreme Court Case No. 20SC852**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 19CA266

**Petitioners:**

Lodge Properties, Inc. and Board of Assessment Appeals,

v.

**Respondent:**

Eagle County Board of Equalization.

**Judgment Reversed**
*en banc*
February 22, 2022

**Attorneys for Petitioner Lodge Properties, Inc.:**
Bryan Cave Leighton Paisner LLP
Michael J. Hofmann
Zachary W. Fitzgerald
    *Denver, Colorado*

Brownstein Hyatt Farber Schreck, LLP
Julian R. Ellis, Jr.
    *Denver, Colorado*

**Attorneys for Petitioner Board of Assessment Appeals:**
Philip J. Weiser, Attorney General
Evan P. Brennan, Assistant Attorney General
    *Denver, Colorado*

**Attorneys for Respondent:**
Bryan R. Treu, Eagle County Attorney
Christina C. Hooper, Senior Assistant County Attorney
  *Eagle, Colorado*

Hamre, Rodriguez, Ostrander & Dingess, P.C.
Donald M. Ostrander
Richard F. Rodriguez
Steven Louis-Prescott
Joel M. Spector
  *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Counties, Inc.:**
Hall & Evans, LLC
Andrew D. Ringel
Ethan E. Zweig
  *Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT**, **JUSTICE MÁRQUEZ**, **JUSTICE HOOD**, **JUSTICE HART**, **JUSTICE SAMOUR**, and **JUSTICE BERKENKOTTER** joined.

2

JUSTICE GABRIEL delivered the Opinion of the Court.

¶1     This case involves the valuation for real property tax purposes of the Lodge at Vail ("the Lodge"), a luxury resort property that includes a hotel, privately owned condominiums, and amenities. We granted certiorari to consider whether (1) fees paid by the condominium owners to a third-party company that manages the rental of their condominiums to overnight guests is intangible personal property that must be excluded from the actual value of the Lodge under the income approach to valuation and (2) the net income generated from such fees should be included in the Lodge's actual value under the income approach.[1]

¶2     We now conclude that the net income generated from rentals of the individually and separately owned condominium units was not income generated

---

[1] The specific issues on which we granted certiorari were framed as follows:

1. Whether the court of appeals erred by holding that a hotel's contractual right to net rental income generated from separately owned, but physically integrated, condominium units is not intangible personal property that must be excluded under section 39-3-118, C.R.S. from the actual value of the hotel under the income approach to valuation in section 39-1-103(5)(a), C.R.S.

2. Whether the court of appeals erred by holding, for the first time, that the net income generated from rentals of individually and separately owned condominium units to guests of a hotel should be included in the actual value of the hotel under the income approach to valuation.

3

by the Lodge and therefore should not have been included in the Lodge's actual value under the income approach to valuation.

¶3 We therefore reverse the judgment of the division below, and we need not consider whether the contractual right to net rental management income generated from the condominiums constituted intangible personal property that must be excluded from the Lodge's actual value under the income approach to valuation.

## I. Facts and Procedural History

¶4 The Lodge is a full-service resort located at the base of the Vail Mountain ski area. Opened in 1962 and owned by petitioner Lodge Properties, Inc. ("LPI"), a subsidiary of Vail Resorts, the Lodge now has eighty hotel rooms and a variety of amenities, including a spa, a fitness complex, a ski valet, a pool, two restaurants, and a pool bar and grill.

¶5 Additionally, in 1970, private condominiums were constructed, creating a north wing of the Lodge and expanding its south wing. Accordingly, in addition to the hotel rooms and amenities noted above, the Lodge's current building envelope includes seventy-four individually owned residential condominium units.

¶6 Some of the owners of these condominium units choose to rent their units to the public for a fee. These owners have the option of using third-party rental

4

management companies to assist with this process, and many have contracted with Vail/Beaver Creek Resort Properties ("VBC"), another subsidiary of Vail Resorts, to provide rental management services. The remainder of the condominium owners either manage the rental process on their own, contract with competitors of VBC, or choose not to rent their properties.

¶7 As to those condominium owners who contract with VBC, their contracts are for a one-year term, which renews automatically at the end of each year, unless either party gives notice of nonrenewal not later than sixty days before the end of the then-current term. In addition, these condominium owners may terminate their contracts, with or without cause, upon giving ninety days' prior written notice. And the contracts automatically terminate upon the transfer of title to the units by the owners.

¶8 The contracts further provide that VBC may assign its interest in the contracts, without the owners' prior written consent, to any entity that acquires VBC or the Lodge's owner.

¶9 Pursuant to these contracts, VBC agrees to provide to the condominium owners, among other things, booking and other rental management services, daily housekeeping services, marketing, and routine repairs and minor maintenance in the condominiums. The contracts also state:

> Manager will provide Hotel Guests and Owner access to all amenities within the Hotel that are available to other guests of the Hotel,

5

including ski storage while Owner or Owner guests are residing in the Unit, internet access, pools, hot tubs, saunas, exercise facilities, and beauty salons and spas as they may exist from time to time (collectively, the "Amenities").

¶10 In exchange for the above-described and other services provided by VBC under the contracts, the condominium owners agree to pay VBC a management fee of forty percent of the gross rental proceeds.

¶11 Despite differences in ownership, as noted above, the Lodge's hotel rooms and the condominiums are all within the Lodge's building envelope, and to that extent, they are physically integrated, such that a typical guest might not know when they are in the condominiums and when they are in the hotel. As part of this physical integration, the condominiums and hotel rooms share an elevator, several stairways, and certain utility lines and equipment.

¶12 As pertinent here, condominium owners are required to join a condominium association, which collects fees that help offset the costs of guest services, housekeeping and maintenance, bell and concierge services, ski storage, maintenance and repair of the pool, and other amenities on site. In addition, guests who stay at the hotel and those who rent a condominium pay a nightly resort fee, which affords all such guests access to many of the Lodge's amenities.

¶13 Prior to 2017, the Eagle County assessor did not include in its calculation of the Lodge's assessed value the net income that VBC received in connection with its contractual services for the condominium owners. In 2017, however, the

6

assessor, apparently for the first time, included such income in the calculation of the Lodge's assessed value. As a result of this change in methodology, the assessor assigned the Lodge an actual value of $41,104,470, reflecting a dramatic increase in the property's value from the previous assessment.

¶14 LPI appealed this valuation to respondent Eagle County Board of Equalization, which denied the appeal. LPI then appealed to petitioner Board of Assessment Appeals ("BAA"), contending that the Eagle County assessor had improperly included in its value calculation the income that VBC generated in connection with its rental management agreements with the condominium owners. In connection with its appeal, LPI requested that the BAA reduce the Lodge's assessed value to $22,800,000.

¶15 The BAA subsequently held a two-day evidentiary hearing on LPI's appeal. At this hearing, LPI asserted that VBC's net condominium management revenues constituted intangible assets that were exempt from property taxes under section 39-3-118, C.R.S. (2021). Consistent with this view, LPI submitted to the BAA income and expense statements showing the historical income and expenses of the Lodge, without including the net income from VBC's rental management agreements.

¶16 Eagle County responded that the net income derived by VBC from the condominium rentals was a real estate ownership benefit that would be factored

7

into any acquisition pricing of the Lodge and therefore this net income was neither business income nor an intangible asset.

¶17    The BAA ultimately found LPI's income and expense analysis to be more credible than that submitted by Eagle County and thus further found that LPI had properly excluded from its Lodge valuation analysis the net income that VBC received in connection with its contractual services for the condominium owners. Specifically, the BAA concluded that VBC's net rental management income "constituted an intangible asset that, while it might be considered in the valuation of a property outside of taxation, did not reflect additional value to the subject real estate."

¶18    In so concluding, the BAA acknowledged Eagle County's position that a key factor in the valuation analysis was whether the value of the rental management income is appended to the property and is thus transferable with the property, or whether it is independent of the property so that the value either stays with the seller or dissipates upon the sale of the subject property.  In light of the evidence before it, the BAA determined that any contributory value of the rental management income associated with the rental management agreements would not transfer with the Lodge in the event of a sale, "as that operation is independent of the subject hotel."  Thus, the BAA concluded that this income was not to be included in the Lodge's valuation, and after applying a 5.5 percent capitalization

rate to the taxable value of the property, the BAA assigned the Lodge an actual value of $26,245,000 for tax year 2017.

¶19 Eagle County then appealed the BAA's order to our court of appeals. In its appeal, Eagle County argued, among other things, that the BAA had erred in (1) determining that the Lodge's value for tax purposes was different from its valuation in the marketplace "outside of taxation" and (2) concluding that the net income derived from VBC's rental management services is an "intangible asset" that does not add value to the Lodge and is therefore not to be included in the calculation of the Lodge's assessed value.

¶20 In a unanimous, published opinion, the division vacated the BAA's order. *Lodge Props., Inc. v. Eagle Cnty. Bd. of Equalization*, 2020 COA 138, ¶ 47, 490 P.3d 911, 919. In so ruling, the division agreed with Eagle County on both of the foregoing issues. *Id.* at ¶¶ 19, 26, 39–42, 490 P.3d at 915–16, 918–19.

¶21 With regard to the first issue, concerning market value and valuation for tax purposes, the division began by observing that a property's actual value is synonymous with market value, or "what a willing buyer would pay a willing seller under normal economic conditions." *Id.* at ¶ 19, 490 P.3d at 915 (quoting *Bd. of Assessment Appeals v. Colo. Arlberg Club*, 762 P.2d 146, 151 (Colo. 1988)). The division then opined that the BAA had derived a standard for calculating the actual value of property for tax purposes that is different from the standard used

for other purposes, although the legislature had never indicated an intent to draw such a distinction. *Id.* at ¶ 21, 490 P.3d at 915. Thus, the division concluded that the Lodge's actual value had to be measured by its market value, and because, in the division's view, the contributory value of the rental management income would be a factor considered by a willing buyer and a willing seller in any sale of the Lodge, that income had to be included in the value calculation. *Id.* at ¶¶ 22–26, 490 P.3d at 915–16.

¶22 As to Eagle County's argument concerning whether VBC's net rental income was an intangible asset, the division reasoned that unlike other commonly recognized "intangibles" (e.g., patents, business goodwill, computer programs, literary rights, and stock options), VBC's net rental management income "is, in fact, cash; it is a tangible, inherent benefit in the form of money that is a direct product of the core income-producing business of [the Lodge]." *Id.* at ¶ 39, 490 P.3d at 918. The division thus concluded that the BAA had erred in finding that VBC's net rental management income was an intangible that was to be excluded from the calculation of the Lodge's assessed value, and the division vacated the BAA's order and remanded the case with instructions that the BAA determine the Lodge's actual value after including in its calculation VBC's net income from the condominium rentals. *Id.* at ¶ 41–42, 490 P.3d at 918–19.

¶23 The BAA and LPI each petitioned for certiorari review, and we granted their respective petitions.

## II. Analysis

¶24 We begin by setting forth our applicable standard of review. Next, we discuss the constitutional and statutory frameworks governing the valuation of property for tax purposes. We then consider whether the net income derived from the condominium management fees paid to VBC was generated by the Lodge, such that this income should have been included in the Lodge's actual value under the income approach to valuation.

## A. Standard of Review

¶25 We presume that an assessor's valuation of property for taxation is correct. *Cantina Grill, JV v. City & Cnty. of Denver Cnty. Bd. of Equalization*, 2015 CO 15, ¶ 15, 344 P.3d 870, 876. To rebut this presumption, a taxpayer who challenges an assessor's valuation bears the burden of proving, by a preponderance of the evidence, that the valuation is incorrect. *Id.*

¶26 It is the BAA's function, and not that of a reviewing court, to weigh the evidence and to resolve conflicts therein. *Jefferson Cnty. Bd. of Cnty. Comm'rs v. S.T. Spano Greenhouses, Inc.*, 155 P.3d 422, 424 (Colo. App. 2006). Thus, an appellate court may overturn an order of the BAA "only if it finds an abuse of discretion, or that the order was arbitrary and capricious, based upon clearly erroneous factual

11

findings, unsupported by substantial evidence in the record, or otherwise contrary to law." *Hinsdale Cnty. Bd. of Equalization v. HDH P'ship*, 2019 CO 22, ¶ 19, 438 P.3d 742, 747. Whether net rental management income generated from the rental of condominium units that are physically integrated into a resort property should be included in the actual value of that property under the income approach to valuation is a question of law that we review de novo. *See id.* (noting that we review questions of law de novo).

## B. Real Property Taxation and Valuation

¶27 Article X of the Colorado Constitution sets forth the basic framework for taxation in Colorado. Article X, section 3(1)(a) provides, in pertinent part:

> The actual value of all real and personal property not exempt from taxation under this article shall be determined under general laws, which shall prescribe such methods and regulations as shall secure just and equalized valuations for assessments of all real and personal property not exempt from taxation under this article. Valuations for assessment shall be based on appraisals by assessing officers to determine the actual value of property in accordance with provisions of law, which laws shall provide that actual value be determined by appropriate consideration of cost approach, market approach, and income approach to appraisal.

¶28 The General Assembly has codified this taxation framework in a number of statutes that bear on the issues now before us.

¶29 For example, section 39-1-103(5)(a), C.R.S. (2021), provides, in part:

> All real and personal property shall be appraised and the actual value thereof for property tax purposes determined by the assessor of the county wherein such property is located. The actual value of such

12

property, other than [certain exceptions not applicable here], shall be that value determined by appropriate consideration of the cost approach, the market approach, and the income approach to appraisal.

¶30 Section 39-5-104, C.R.S. (2021), in turn, provides, "Each tract or parcel of land . . . shall be separately appraised and valued, except when two or more adjoining tracts, parcels, or lots are owned by the same person, in which case the same may be appraised and valued either separately or collectively."

¶31 As the foregoing authorities make clear, assessors must separately appraise and value each legally distinct parcel of real property, and the title holders of each separate parcel are responsible for the taxes on those parcels. *See Hinsdale Cnty. Bd. of Equalization*, ¶ 22, 438 P.3d at 747 ("Colorado's tax statutes reflect the legislature's intent to levy property tax on the record fee owner of real property."). Real property includes "[a]ll lands or interests in lands to which title or the right of title" has been acquired from the United States government or the state, as well as "improvements." § 39-1-102(14)(a), (c), C.R.S. (2021). Intangible personal property, in contrast to real property, is exempt from the levy and collection of property tax. § 39-3-118.

¶32 The dispute before us centers on how the Eagle County assessor calculated the value of the Lodge under the income approach to valuation. As we have previously observed, the income approach is a common method for calculating the value of commercial properties. *Bd. of Assessment Appeals v. E.E. Sonnenberg &*

*Sons, Inc.*, 797 P.2d 27, 30 n.8 (Colo. 1990). This approach "generally involves calculating the income stream (rent) the property is capable of generating, capitalized to value at a rate typical within the relevant market." *Id.*; *see also Denver Urb. Renewal Auth. v. Berglund-Cherne Co.*, 568 P.2d 478, 480 (Colo. 1977) ("The capitalization of income approach is utilized by appraisers to formulate an opinion as to value which reflects the net income generated by the property during the remainder of its productive life."); 16 Eugene McQuillin, *The Law of Municipal Corporations* § 44:143, at 632 (3d ed. 2013) (explaining that the income approach involves "determining the rental value of the property, deducting from it the operating expenses, and, if there is a profit, capitalizing the net profit at a percentage commensurate with the amount of risk involved").

## C. Application

¶33  Turning then to the facts before us, we must determine whether the net income that VBC derived in connection with its rental management agreements is part of the income stream that the Lodge is capable of generating, such that this net income is properly considered in valuing the Lodge under the income approach. We conclude that it is not.

¶34  It is undisputed that the Lodge and the condominiums are legally separate and distinct parcels of real property, and therefore, these properties must be separately appraised and valued. Accordingly, rental income generated by the

14

condominiums cannot be assigned to the Lodge, which is a separate parcel of real property owned by a different taxpayer. The question thus becomes whether VBC's net rental management income was generated by the condominiums, or whether it was, in fact, generated by the Lodge. For several reasons, we conclude that this net income was generated by the condominiums.

¶35 First, on its face, the income at issue resulted from rentals of the condominiums. The condominium owners, at their option, chose to rent their condominiums to others, and, as a matter of contract law, the fees paid by the renters were for the use of the condominiums. The fact that the owners then paid VBC a fee for its rental management services does not alter the fact that the income was derived from the condominium rentals.

¶36 Second, and related to the first point, we perceive no basis for taking VBC's net rental management income, which was paid from the condominium owners' rental income, and allocating that income to LPI's ownership of the Lodge. VBC owns no real property at all, so its contractual income was not generated by any real property of VBC's. Nor can we say that VBC's contractual income either was generated by the Lodge or was somehow attributable to LPI's ownership of the Lodge. To the contrary, in our view, VBC's rental management income is precisely what the rental management agreements say it is: "compensation for the management services provided under this Agreement," including managing and

15

operating the condominiums as rental units and offering and renting those units to transient guests when not occupied by the owners or the owners' guests; implementing a standard of maintenance, repair, service, and operation; establishing rental rates and collecting payment for condominium rentals; providing daily housekeeping services; marketing the condominium units; performing routine repairs and minor maintenance; and, at the owners' option, managing the payment of any assessments or fees due to the condominium association. Simply stated, VBC's rental management agreements are contracts for VBC's management services, paid for out of net rental income generated by the condominiums; the agreements are not contracts for an interest in (or the use of) the Lodge's real property.

¶37 Third, and notwithstanding Eagle County's suggestion to the contrary, VBC's rental management agreements are not, in reality, contracts for the use of the Lodge's real property and amenities. Were we to accept such an argument, we would need to disregard most of the language of VBC's rental management agreements (and the fact that the agreements pertain to rentals of the condominiums, which are separate parcels of real property from the Lodge). We, however, may not do so. *See Owners Ins. Co. v. Dakota Station II Condo. Ass'n*, 2019 CO 65, ¶ 32, 443 P.3d 47, 51 (noting that courts give effect to the intent and reasonable expectations of contracting parties by enforcing the plain language of

16

their contract); *McShane v. Stirling Ranch Prop. Owners Ass'n*, 2017 CO 38, ¶ 16, 393 P.3d 978, 982 ("[W]e hold no authority to rewrite contracts and must enforce unambiguous documents in accordance with their terms."); *U.S. Nat'l Bank of Denver v. Bartges*, 210 P.2d 600, 606 (Colo. 1949) (noting that courts do not have the authority to ignore a contract that was fairly and intelligently made by the parties).

¶38     In so concluding, we acknowledge the contractual provision stating, "Manager will provide Hotel Guests and Owner access to all amenities within the Hotel that are available to other guests of the Hotel." Contrary to Eagle County's assertions, however, this language does not establish that the condominium owners must contract with VBC to secure access to the Lodge's amenities and that, therefore, the Lodge, and not the condominiums, is actually generating the net rental management income.

¶39     For one, the spa referenced in the rental management agreements is open to the public. Moreover, as noted above, condominium guests pay a hotel resort fee that allows them to use the Lodge's amenities. And, as also noted above, the condominium owners pay condominium association fees that, in part, offset the costs of maintaining the Lodge's amenities, and a management agreement between the condominium association, LPI, and a number of its associated entities provides that "[b]ell services, concierge services, ski storage," and other services "shall be provided to all owners, their guests, and invitees." These facts belie any

17

assertion that VBC serves as a gatekeeper to the Lodge's amenities, such that access to the Lodge's amenities is what condominium owners are actually contracting for in their rental management agreements with VBC.

¶40 Nor does the fact that some condominium owners use VBC, rather than a less expensive rental management service provider, show that the rental management agreements between the condominium owners and VBC were actually contracts for access to the Lodge's amenities. Eagle County contends that, were it not for the access to amenities that VBC provides, "prudent condo owners would exclusively utilize vacation-rental-by-owner services that charge between 3% and 15% of gross revenues for limited marketing and reservation services," such as Vrbo and Airbnb, rather than paying a forty percent fee to VBC. This argument ignores the fact that entities like these do not provide the same cleaning, customer-relations, booking, maintenance, and other services that VBC offers. *See, e.g.*, Vrbo, All FAQs, https://host.expediagroup.com/vrbo/en-us/help/all-faqs [https://perma.cc/9NQM-85A9]. Nor do these entities share VBC's access to the Lodge's platform for marketing and booking available units, which many condominium owners may view as providing added value. Accordingly, notwithstanding Eagle County's supposition to the contrary, a prudent condominium owner might well choose to contract with VBC, irrespective of any access to the Lodge's amenities.

18

¶41   For all of these reasons, we conclude that the net income generated from rentals of the individually and separately owned condominiums was not income generated by the Lodge, and therefore this income should not have been included in the Lodge's actual value under the income approach to valuation. *See E.E. Sonnenberg & Sons, Inc.*, 797 P.2d at 30 n.8 (explaining that the income approach involves calculating the income stream that "the property is capable of generating").

¶42   We respectfully believe that, in reaching a contrary determination, the division below erred in several ways.

¶43   First, the division construed "the foundation of the income approach to valuation" as "the capitalization of such income streams *attributable to property ownership*." *Lodge*, ¶ 39, 490 P.3d at 918 (emphasis added). This, however, is not the correct standard. As noted above, the income approach requires the assessor to consider the income that the "[subject] property is capable of generating." *E.E. Sonnenberg & Sons, Inc.*, 797 P.2d at 30 n.8. By including VBC's net rental management income within the sweep of income "attributable to property ownership," the division impermissibly expanded the income approach to include in the Lodge's valuation contractual rights to revenue generated by a different property.

¶44 Second, although a property's market value is certainly a measure of property valuation for tax purposes, *see Bd. of Assessment Appeals v. Sampson*, 105 P.3d 198, 203 (Colo. 2005), in concluding that the net rental management income at issue was part of the Lodge's market value, the division appears to have substituted its own factual finding for that of the BAA. Specifically, after observing that "[a] property's actual value is synonymous with market value," the division focused its analysis on whether VBC's net rental management income would factor into "what a willing buyer would pay a willing seller under normal economic conditions" upon the sale of the Lodge. *Id.* at ¶ 19, 490 P.3d at 915 (quoting *Colo. Arlberg Club*, 762 P.2d at 151). The division opined that it would, stating, "[W]e are hard-pressed to believe that a purchaser of [the Lodge] would agree to the sale without also securing the rental contracts that would allow it to collect over $3.6 million in rental revenue." *Lodge*, ¶ 24, 490 P.3d at 916.

¶45 In so finding, however, the division appears to have rejected, as unsupported by the record, the BAA's express determination that "any contributory value of the rental management income associated with the management of the third-party owned condominiums would not transfer with the subject hotel in the event of sale, as that operation is independent of the subject hotel." But the BAA's finding was, in fact, supported by evidence in the record before it. For example, the Lodge's expert expressly testified that the

20

condominium management is separate and divisible from the Lodge's real property, noting that the rental management could be operated by third-parties having no ownership stake in the hotel. The expert further testified that the rental management income would not necessarily transfer upon the sale of the Lodge, and he opined that the Lodge's owner had no inherent right to manage any of the independently owned condominiums. Accordingly, the BAA's finding was neither arbitrary and capricious nor clearly erroneous, and it was therefore entitled to deference, even if other record evidence might have supported a contrary determination. *See Hinsdale Cnty. Bd. of Equalization*, ¶ 19, 438 P.3d at 747 ("An appellate court may set aside an order of the BAA only if it finds an abuse of discretion, or that the order was arbitrary and capricious, based upon clearly erroneous factual findings, unsupported by substantial evidence in the record, or otherwise contrary to law.").

¶46 In addition to the foregoing, the division's market value analysis appears to have conflated the value of Vail Resorts (the ultimate parent company) and the value of the Lodge. Although a Vail Resorts subsidiary's income might well impact Vail Resorts' market value, that is a different question from whether the same income can be said to have been generated by the Lodge, such that it should be included in the Lodge's valuation. Thus, although VBC also provides rental management services to condominium owners at the Ritz-Carlton Club in Vail (a

21

different resort property), no one would argue that the income that VBC generates from providing those services would be relevant to the Lodge's valuation.

¶47 Third, the division appears to have placed significant weight on the physical integration of the condominiums into the Lodge's building envelope, a position that Eagle County pursues here. Physical integration, however, does not alter the well-settled principle, discussed above, that legally distinct parcels of real property must be separately valued and appraised. Nor does physical integration alone establish that the income at issue was generated by the Lodge.

¶48 In reasoning to the contrary, the division cited no applicable authority indicating that the physical integration of two otherwise separate properties justifies including income generated by one property in the value of the other. And although Eagle County now argues that the Wisconsin Supreme Court's reasoning in *ABKA Limited Partnership v. Board of Review*, 603 N.W.2d 217 (Wis. 1999), is directly on point and supports the division's ruling, we disagree.

¶49 In *ABKA*, the Wisconsin Supreme Court considered whether an assessor properly included in the valuation of a resort hotel the hotel owner's income from the management of rental condominiums that were located adjacent to the hotel. *Id.* at 219–20. The court concluded that the rental management income was properly included in the hotel's valuation pursuant to the income approach because that income was "inextricably intertwined" with the hotel. *Id.* at 225.

Specifically, in the court's view, the management fees were generated both by and on the land on which the hotel was located, and the ability to earn such fees was transferable to future hotel purchasers. *Id.* Thus, the court concluded that the income "appertain[ed]" to the hotel under Wisconsin law. *Id.*

¶50 *ABKA* is distinguishable from the case before us, however, because the statute underlying the decision in that case was different from the statute underlying our ruling here. Specifically, under applicable Wisconsin law, "real property" includes "not only the land itself but all buildings and improvements thereon, and all fixtures *and rights and privileges appertaining thereto*." Wis. Stat. § 70.03 (2021) (emphasis added). Colorado law, in contrast, does not include within its definition of real property "rights and privileges appertaining" to land or improvements. *See* § 39-1-102(14). And it is worth noting that in *Adams Outdoor Advertising, Ltd. v. City of Madison*, 717 N.W.2d 803, 821–22 (Wis. 2006), the Wisconsin Supreme Court pointed out the limitations to the rule that it adopted in *ABKA*, stating that the court's holding in *ABKA* derived from Wisconsin's particular definition of real property.

¶51 Specifically, in *Adams*, the court observed, "A review of the cases leading up to *ABKA* demonstrates that inclusion of business value in a property assessment should be the exception, not the norm." *Id.* at 821. The court further noted that "integral to the analysis" in *ABKA* and several cases like it "was the conclusion

23

that the income appertained to the real property under Wis. Stat. § 70.03, and therefore, was a proper element to include in the real estate assessment under [the applicable Wisconsin statute]." *Id.* at 822. The *Adams* court continued, "The conclusions in these cases depend upon the definition of real property in Wis. Stat. § 70.03, which includes 'all buildings and improvements thereon, and all fixtures and *rights and privileges* appertaining thereto[.]'" *Id.* (quoting Wis. Stat. § 70.03) (emphasis in original). The court therefore concluded, "Thus, in *ABKA* the management income derived from adjacent real estate could be included in the assessment because the physical proximity and interdependency of the real estate meant the income *was a privilege appertaining to the subject real estate*, rather than the product of the owner's skill and business acumen." *Id.* (emphasis added); *accord Walgreen Co. v. City of Madison*, 752 N.W.2d 687, 704–05 (Wis. 2008).

¶52 Accordingly, the Wisconsin case law on which Eagle County relies is inapposite.

¶53 Finally, we are unpersuaded by the public policy concerns and parades of horribles posited by Eagle County and its amicus. Although Eagle County states that the conclusion we reach today encourages corporations to evade taxes by "engaging in gamesmanship or manipulation of their corporate entity structures," we perceive no basis for any assertion of tax evasion, manipulation, or gamesmanship on LPI's (or any other party's) part here. At best, Eagle County

24

points to the fact that LPI and VBC are part of a network of companies within Vail Resorts' corporate structure. Although Eagle County perceives something nefarious about this, such an interlocking network of related entities serving different roles within a corporate entity's family is common and does not alone establish a corporate scheme to avoid taxation. Indeed, we have seen no evidence in the record before us to suggest that any person or entity in this case has avoided paying real property or other taxes properly levied. Nor can we conclude that VBC's revenue from providing contractual management services to the condominium owners was generated by the Lodge merely because VBC (either directly or through subcontractors) happened to be the entity providing such services.

¶54 We likewise do not agree with amicus Colorado Counties, Inc.'s ("CCI's"), contention that including income from VBC's rental management agreements in the valuation of the Lodge is necessary to maintain "uniformity and fairness." According to CCI, as a result of the conclusion we reach today, "every commercial property will be assessed according to its unique corporate ownership structure and corporate financing methods, and property owners will be subject to taxes not imposed on others." This, CCI suggests, will sow discord because "[n]o corporate structure is the same."

¶55     Notwithstanding CCI's expressed concerns, the conclusion that we reach today requires an assessor employing the income approach to do no more than determine which real property has generated the income at issue before including that income in the value calculation. This, however, is an analytical step that the income approach has long required. And to the extent that an assessor perceives questionable dealings undertaken to avoid taxation, the assessor and courts have long had (and have utilized) tools to assess such transactions, and nothing we say today imposes any additional burden on assessors. *See Hinsdale Cnty. Bd. of Equalization*, ¶ 27, 438 P.3d at 748 (noting that doctrines such as the substance-over-form and economic substance doctrines are available to "call out questionable transactions undertaken to minimize or avoid income tax by requiring a transaction to comply with the underlying purpose of a tax statute and not just its language").

¶56     CCI further reminds us that counties rely on property tax revenues to fund "schools, libraries, fire protection, water, sanitation, law enforcement, and infrastructure." We are, of course, sympathetic to the financial strain on Colorado counties, particularly in light of today's economic realities and infrastructure needs. We, however, are not at liberty to ignore the long-settled principles of real estate valuation and taxation that compel the conclusion that we reach today.

¶57 Accordingly, we conclude that the net income generated by VBC from the rental management agreements between it and the condominium owners was not income generated by the Lodge and therefore should not have been included in the Lodge's valuation under the income approach to valuation.

¶58 In light of this disposition, we need not consider whether the net rental income at issue also constituted intangible personal property, requiring that it be excluded from the Lodge's valuation under the income approach.

### III. Conclusion

¶59 Contrary to Eagle County's assertions and the conclusion of the division below, the net rental management income realized by VBC from its rental management agreements with third-party condominium owners was not income generated by the Lodge. Accordingly, the division below erred in concluding that such income was to be included in the Lodge's actual value under the income approach to valuation.

¶60 We therefore reverse the judgment of the division below, and we remand this case for further proceedings consistent with this opinion.