24CA0397 Wilson v Howe 02-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0397
Jefferson County District Court No. 23CV30230
Honorable Philip J. McNulty, Judge

---

Ingrid Stitt Wilson, in her official capacity as Trustee of the Last Straw
Revocable Living Trust,

Plaintiff-Appellant,

v.

Collin Howe, the Public Trustee of Jefferson County,

Defendant-Appellee.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE SCHOCK
Freyre and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 6, 2025

---

Wilson Law Office P.C., Brian Herbert Wilson, Jr., Bailey, Colorado, for
Plaintiff-Appellant

Walsh Law, P.C., Thomas A. Walsh, Marilana S. Walsh, Golden, Colorado, for
Defendant-Appellee

¶ 1    Plaintiff, Ingrid Stitt Wilson, in her capacity as trustee of the Last Straw Revocable Living Trust (the Trust), appeals the district court's entry of summary judgment in favor of defendant, Collin Howe, on the Trust's claims for lot line acquiescence, easement by estoppel, irrevocable license, and adverse possession.  We reverse the judgment on the adverse possession claim but otherwise affirm.

## I.    Background

¶ 2    The Trust and Howe own two adjacent properties, which we will refer to as the Trust Property and the Howe Property.  The Trust Property is a generally square parcel of property with a cabin on it, identified as "Parcel A" and "2 story wood frame house," respectively, on the map below.  The Howe Property is a much larger property that wraps around the Trust Property to the east and south, identified as "Unplatted" on the map below.  A driveway runs across the Howe Property from the southern boundary of the Trust Property to a public road south of the Howe Property.



¶ 3    The Trust Property was owned by Jason Yardley from 1967 to 1999.  For most of the time that Yardley owned the property, there was no driveway, and he accessed the cabin via a walking path from what is now Fisher Road on the north side of the property.  According to Yardley, he used the area around the cabin — as

depicted in the below map — as his own for more than twenty years because he believed it was part of his property.[1]



DATE FILED: August 24, 2023 5:10 PM

Jason Yardley affidavit
Exhibit 1

Twin Spruce Cabin Plat

Scale 1:325          8/17/2023

¶ 4    Over time, various improvements were constructed on the area surrounding the cabin. In 1976, Yardley built a goat shed southwest of the cabin — outside the boundary of the Trust Property but within the area Yardley believed was his. That shed was later converted into a sleeping cabin, lived in by Yardley's son, and, more recently, used for storage by Howe's brother. In the early 1980s, Yardley's wife constructed a well for household purposes,

---

[1] The Trust referred to this area as a "roughly crescent moon shaped area" in its motion for summary judgment.

3

just east of the northern boundary of the Trust Property. From 1992 to 1999, Yardley allowed a friend, Kelley Anne Winston, to live in the cabin. Winston made improvements to the cabin, including the addition of a deck, and placed a large propane tank east of the cabin, just outside the eastern boundary of the Trust Property.

¶ 5 The driveway to the cabin (which crosses the Howe Property) was constructed sometime between 1992 and 1998. Although the circumstances surrounding the construction of the driveway are unclear, Yardley understood that it was built by Winston's husband "by an agreement with [the prior owner of the Howe Property] for the benefit of [the Trust Property]." The driveway connects the public road to the cabin and, according to Yardley, serves no purpose other than to access the cabin. Around the same time, a barbed wire fence was placed along the east side of the driveway.

¶ 6 Yardley sold the Trust Property to Winston in 1999. Two years later, in 2001, Howe purchased the Howe Property. In connection with that purchase, the prior owner of the Howe Property and Winston entered into a "Permissive Use Drive Agreement," which granted Winston "permissive use" of the driveway "for residential use and good neighbor ease of access use only." The Agreement

4

stated that "no transfer of property or easement [was] involved in this agreement." Howe also received a land survey plat, dated 1992 and recorded in 2001, which noted that "temporary verbal permission has been given for a roadway for the rent[e]r of [the Trust Property] to access said lot . . . across [the Howe Property]."

¶ 7 In 2003, Winston died, and Howe installed a locked gate that prevented use of the driveway by anyone other than Howe and his family. Yardley took back possession of the Trust Property in 2005 and, until 2020, travelled there annually to perform maintenance and upkeep. The extent to which Yardley used the driveway during that timeframe is in dispute. But on at least one occasion in 2015, Howe allowed Yardley to use the driveway to fix the cabin roof.

¶ 8 In 2020, Yardley received a sheriff's deed to the Trust Property and sold it to the Trust. At that time, the cabin was in disrepair, and Howe agreed the Trust could use the driveway to work on the cabin. But the parties dispute the scope of that permission. Howe maintains that he granted the Trust temporary permission to use the driveway only for purposes of repairing the cabin roof. Wilson, the trustee of the Trust, claims that Howe "promised that he would not cut off the driveway while [the Trust] was working on the cabin."

¶ 9    The Trust's work on the cabin continued for more than two years and included the addition of a second story. But the Trust ran into permitting problems and construction was suspended. In March 2023, Howe locked the gate to the driveway and denied the Trust further access over the driveway to the Trust Property.

¶ 10    The Trust filed a quiet title action, asserting claims for (1) lot line adjustment by acquiescence, *see* § 38-44-109, C.R.S. 2024; (2) easement by estoppel; (3) irrevocable license; (4) prescriptive easement; and (5) adverse possession. Together, these claims sought to establish the fence along the driveway as the boundary between the Trust Property and the Howe Property (the first claim); secure a right of access over the driveway (the second and third claims); and expand the Trust Property to include the surrounding area historically used by Yardley (the fourth and fifth claims).

¶ 11    Howe moved for partial summary judgment on all claims except the adverse possession claim. The Trust moved for partial summary judgment on all claims except lot line acquiescence.

¶ 12    The district court entered a single order resolving the parties' cross-motions, primarily in favor of Howe. The court granted summary judgment in Howe's favor on the Trust's claims for lot line

acquiescence, easement by estoppel, and irrevocable license. It concluded that there was no genuine issue of material fact that (1) the fence was never recognized as a boundary line between the properties; and (2) any agreement for the Trust and its predecessors to use the driveway was permissive and temporary, not permanent.

¶ 13 As to the claims for prescriptive easement and adverse possession, the court divided the disputed area into five components: the cabin encroachments, the goat shed, the propane tank, the well, and the area around the cabin. The court granted summary judgment in favor of Howe as to the goat shed and the area around the cabin. It granted summary judgment in favor of the Trust as to the propane tank and the well. And it denied summary judgment as to the encroachments. Howe later confessed judgment as to adverse possession of the encroachments.

¶ 14 The Trust filed a motion for reconsideration of the court's summary judgment ruling. Among other things, the motion included a new affidavit from Daryl L. Jackson, who lived at the Trust Property with Winston from 1991 to 1999. In the affidavit, Jackson claimed that he built a septic tank for the prior owner of the Howe Property in exchange for a driveway easement but that

the owner "doubled back on his deal" and did not record the easement. The Trust also argued in its motion that the district court had erred by granting summary judgment against it on its adverse possession claim as to the goat shed and area around the cabin, when Howe had not moved for summary judgment on that claim. The district court denied the motion for reconsideration.

¶ 15 The Trust then filed a C.R.C.P. 59 motion, arguing that the summary judgment order did not sufficiently define the boundaries of the property granted to each party to allow for complete adjudication. The district court denied that motion as well.

## II. Summary Judgment

¶ 16 The Trust argues that the district court erred by granting summary judgment in favor of Howe on the Trust's claims for lot line acquiescence, easement by estoppel, irrevocable license, and adverse possession of the goat shed and the area around the cabin.[2]

---

[2] The Trust does not challenge the summary judgment on its claim for prescriptive easement other than to argue that the district court misunderstood the claim as including the driveway. To the extent the Trust complains that the court granted summary judgment against it on a claim it did not make, any error is harmless.

8

## A. Standard of Review

¶ 17 We review an order granting summary judgment de novo, applying the same standard as the district court. *Poudre Sch. Dist. R-1 v. Stanczyk*, 2021 CO 57, ¶ 12. Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c).

¶ 18 The moving party bears the initial burden of showing the "absence of evidence in the record to support the nonmoving party's case." *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo. 1987). If the moving party meets this burden, the burden shifts to the nonmoving party to establish a triable issue of fact. *Id.* at 713.

¶ 19 In determining whether this standard is satisfied, we give the nonmoving party "the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts and resolve[] all doubts against the moving party." *City of Fort Collins v. Colo. Oil & Gas Assoc.*, 2016 CO 28, ¶ 8. But in opposing summary judgment, the nonmoving party may not "rest on its mere allegations or denials of the opposing party's pleadings." *Id.* Instead, it must "provide specific facts demonstrating a genuine issue for trial." *Id.*

## B. Lot Line Acquiescence

¶ 20    The Trust first contends that the district court erred by granting summary judgment on its lot line acquiescence claim. It argues that there is a genuine factual dispute as to whether the fence along the driveway was recognized as the boundary line between the Trust Property and the Howe Property. We disagree.

¶ 21    Under the boundary by acquiescence doctrine, a physical barrier such as a fence can replace the property line as the legal boundary between two properties when the neighboring property owners "mutually treat that physical barrier — and not the property line — as the boundary between the properties for over twenty years." *Cronk v. Bowers*, 2023 COA 68M, ¶ 9; *see also* § 38-44-109. To establish a boundary by acquiescence, the claimant must prove (1) the adjacent owners' mutual acquiescence in the fence as the boundary line between the properties (2) for twenty years or more. *Cronk*, ¶ 11. Mutual acquiescence may be demonstrated by the claimant's "actual possession" of the disputed property. *Id.*

¶ 22    Mutual acquiescence is generally a question of fact. *Id.* at ¶ 12. But as with any factual question, summary judgment may be

appropriate if the claimant is unable to point to any evidence demonstrating a genuine issue for trial. *See City of Fort Collins*, ¶ 8.

¶ 23    The undisputed evidence — consisting of two different land surveys, one conducted in 1992 and the other in 2023 — shows the property lines between the Trust Property and the Howe Property. As indicated on the below map, which the Trust attached to its summary judgment briefing, the property lines for the Trust Property end before the fence even begins.[3]  In other words, the fence does not run between the two properties, as a property line would; it runs solely across the Howe Property.  Because no portion of the Trust Property is on the other side of the fence, the fence, by definition, cannot be a boundary line between the properties.

---

[3] The Trust's complaint attaches a map with a diagram of the fence continuing north parallel to the Trust Property lot line.  But Wilson's affidavit describes the fence as "on the lower driveway . . . bound[ing] the driveway from the rest of the [Howe Property]."  And in any event, the Trust clarified in its summary judgment briefing that its lot line acquiescence claim applied only to the portion of the property west of the fenced area along the driveway.



DATE FILED: August 24, 2023 5:10 PM

Exhibit 40

| | Twin Spruce Cabin Plat |
|---|---|
| Scale 1:400 | 8/23/2023 |

¶ 24    Moreover, in Howe's affidavit, Howe explained that the fence was built to contain livestock on a portion of the Howe Property and that, to his knowledge, no one had ever claimed the fence was a boundary line between the properties. *See Kelly v. Mullin*, 413 P.2d 186, 188 (Colo. 1966) (affirming finding that a fence was "merely a barrier and not a boundary line" where it served the purpose of separating distinct portions of the property). As Howe asserted in his affidavit, the fence "is not near any boundary between the properties" but is "situated in the middle of [the Howe Property]."

¶ 25    In an attempt to create a genuine issue of material fact, the Trust relies exclusively on the existence of the fence. But the "mere existence of a fence with evidence of nothing more is insufficient to sustain a finding that the fence operates as a boundary by acquiescence." *Terry v. Salazar*, 892 P.2d 391, 393 (Colo. App. 1994), *aff'd*, 911 P.2d 1086 (Colo. 1996). And the Trust presented no evidence that the property owners ever treated the fence as a boundary line between their properties. Neither Wilson's assertion that the fence "looks like a boundary fence" nor Yardley's statement that the fence was "much closer to the actual boundary line [he] understood" shows an agreement to treat it as such. Nor is there any evidence that the Trust or its predecessors ever actually possessed the property to the west of the fence. *See Cronk*, ¶ 11.

¶ 26    Indeed, beginning in 2001, the property owners' course of conduct indisputably indicates that they did *not* treat the fence as a boundary line but rather understood that the driveway was on the Howe Property. First, the Permissive Use Drive Agreement — executed in 2001 by the parties' predecessors — says so. That agreement would have been unnecessary if the driveway was on the Trust Property. Second, Howe consistently exercised control over

the driveway starting in 2003 when he installed a locked gate and allowed others to use it only with his permission. Although Yardley claims that Howe "cooperated with [his] using the road," he does not dispute that it was on Howe's property. Third, Wilson asserts in her affidavit that, in purchasing the Trust Property, she relied on Howe's "promise[] that he would not cut off the driveway" — a promise that, again, implied the driveway was on his property.

¶ 27 Thus, even if the property owners had acquiesced in the fence as the boundary line when it was built in the 1990s — and there is no evidence that they did — any such acquiescence ended in 2001 when the Permissive Use Drive Agreement was executed, and certainly by 2003 when Howe installed the locked gate. The Trust therefore failed to show any genuine issue of material fact as to whether the property owners mutually acquiesced in the fence as the boundary line for the required twenty years. *See Cronk*, ¶ 11.

¶ 28 Because the Trust did not present any specific facts showing a genuine issue for trial, the district court correctly granted summary judgment against the Trust on its lot line acquiescence claim.

## C. Easement by Estoppel

¶ 29     The Trust next argues that the district court erred by granting summary judgment on its claim for an easement by estoppel across the driveway, asserting that the Trust Property owners have long relied on the driveway to access the cabin. We disagree that the Trust established a genuine issue of material fact on this claim.

¶ 30     A claim for easement by estoppel has three elements: (1) the owner of the servient estate permitted another to use the land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked; (2) the user substantially changed position in reasonable reliance on that belief; and (3) injustice can be avoided only by recognizing an easement by estoppel. *Lobato v. Taylor*, 71 P.3d 938, 950–51 (Colo. 2002).

¶ 31     In Howe's motion for partial summary judgment, Howe presented evidence that his predecessor's permission for Winston to use the driveway was temporary only. First, the 1992 land survey states that "temporary verbal permission has been given for a roadway" across the Howe Property. Second, the 2001 Permissive Use Drive Agreement indicates that the use was "permissive" and

did not create any "transfer of property or easement." Although the Permissive Use Drive Agreement could not have extinguished an easement by estoppel if one had already existed, it is some evidence that the property owners at the time understood that the driveway access was temporary and revocable. Together, this evidence satisfied Howe's initial burden of showing the absence of any evidence to support a reasonably foreseeable belief by the Trust Property owners that the permission would not be revoked. *See id.*

¶ 32 The Trust presented no evidence to the contrary. Indeed, the Trust presented no evidence — at least not by anyone with personal knowledge — of the circumstances of the original permitted use at all. The closest it comes is Yardley's affidavit. Yardley explained that it was his "understanding" that Winston's husband built the driveway with the agreement of the Howe Property owner. But he acknowledged that he "did [not] know about the road for a while" and was "not sure exactly why they built the driveway." *See* C.R.C.P. 56(e) ("[A]ffidavits shall be made on personal knowledge . . . ."). And in any event, Yardley said nothing about whether the supposed agreement was temporary or permanent.

¶ 33    There was also mention in both Wilson's affidavit and Howe's deposition of an agreement between the prior property owners under which Winston provided work on a septic system on the Howe Property in exchange for driveway access.[4]  But neither Wilson nor Howe has any personal knowledge of this purported deal, having both purchased their properties years later.  *See USA Leasing, Inc. v. Montelongo*, 25 P.3d 1277, 1279 (Colo. App. 2001) (concluding that affidavit was inadequate where it did not affirmatively show that the affiant had any "personal knowledge of the relevant facts").  Moreover, even if the parties' secondhand accounts of this agreement could be considered, the only evidence as to its temporary or permanent nature was Howe's testimony that "no easement rights [or] permanent permission [were] granted."

¶ 34    The Trust relies on the affidavit from Jackson that it submitted with its motion for reconsideration, in which Jackson said he built a septic system for Howe's predecessor in exchange for an easement.  But because the Trust did not present this evidence until *after* the entry of summary judgment, we may not consider it.

---

[4] Winston was not technically an owner of the Trust Property until 1999, but we refer to her as an owner for the sake of simplicity.

*See United States v. City of Golden*, 2024 CO 43M, ¶ 77; *McDonald v. Zions First Nat'l Bank, N.A.*, 2015 COA 29, ¶ 85.  To the extent the Trust implies that the district court should have considered Jackson's affidavit in ruling on its motion for reconsideration, it offers no persuasive explanation as to why it could not have discovered this evidence sooner.[5]  *See McDonald*, ¶¶ 87-88.

¶ 35     We acknowledge that Winston's construction of the driveway and renovation of the cabin might support an inference that she believed the access would not be revoked.  But it is not enough that Winston *believed* the permission would not be revoked.  The Trust must show that such belief — and a corresponding substantial change in position — was reasonably foreseeable.  *See Lobato*, 71 P.3d at 950-51.  Given that the sole evidence in the record indicates

---

[5] The Trust's sole explanation for the belated submission of Jackson's affidavit is that "it took a number of months to locate him."  But it was the Trust that filed this lawsuit.  If Jackson's testimony was critical to its claim, it should have obtained that information *before* filing the lawsuit or, at a minimum, in the nine months between the filing of the complaint and the entry of summary judgment.  Indeed, at the time of the summary judgment ruling, trial was scheduled to begin in four days.  The Trust did not present the affidavit until nine days *after* that scheduled trial date.

that the permission was temporary and permissive, the Trust did not demonstrate a genuine issue of material fact on this point.[6]

¶ 36 Nor did the Trust show a genuine factual dispute as to whether an easement by estoppel arose from *Howe's* permission for Yardley or the Trust to use the driveway. As to Yardley, although he says Howe "cooperated with [his] using the road" and he "expected to be able to continue to use the road," the only evidence of Howe's affirmative permission is Howe's representation that he only granted Yardley permission to use the driveway once "for a few weeks so that he could patch the roof" on the cabin. There is also no evidence that Yardley substantially changed his position in reliance on a belief that the driveway access would not be revoked.

¶ 37 As to the Trust, there is evidence of reliance. Wilson and her son attest that the Trust purchased the Trust Property based on Howe's assurances that he would allow them to use the driveway. But even Wilson and her son characterize this promise as limited in

---

[6] It is also not clear how the Trust asserts that Winston substantially changed her position in reliance on the driveway access. Although she made improvements to the cabin, the driveway is not the only way to access the cabin. It is the easiest way, but Yardley used a different access point for decades.

19

time and scope: Howe would not cut off driveway access "while [the Trust was] working on the cabin." Such a conditional promise cannot support an easement by estoppel — a permanent property right — as a matter of law. *See id.* at 951 ("Whether reliance is justified depends upon the nature of the transaction . . . .")

¶ 38 Thus, the Trust presented no evidence demonstrating any genuine factual dispute that it was reasonable for the Trust or its predecessors to believe that their permission to use the driveway would not be revoked. The district court therefore correctly granted summary judgment on the Trust's claim for easement by estoppel.

### D. Irrevocable License

¶ 39 The Trust's irrevocable license argument parallels its easement by estoppel argument, and we reject it for the same reason.

¶ 40 Like an easement by estoppel, an irrevocable license arises from the licensee's reasonable and detrimental reliance on the licensor's promise to afford the licensee a particular right. *See Lobato*, 71 P.3d at 951; *State Dep't of Highways v. Woolley*, 696 P.2d 828, 831 (Colo. App. 1984). But the license becomes enforceable only to the extent reasonably necessary to realize the licensee's reasonable expectations. *Woolley*, 696 P.2d at 831.

¶ 41　　Because the evidence provides no basis for a reasonable expectation by the Trust or its predecessors that their right to use the driveway would be permanent, it cannot support a claim for an irrevocable license.  *See id.* at 829-31 (holding that "Permanent Right of Entry" was enforceable based on licensor's representations as to duration of license); *Patzer v. City of Loveland*, 80 P.3d 908, 911 (Colo. App. 2003) ("[O]rdinarily, the license is revocable at the will of the licensor."); Restatement (Third) of Prop.: Servitudes § 2.16 cmt. f (Am. L. Inst. 2000) ("Unless additional facts suggest otherwise, it is assumed that the parties intended that the property owner retain the right to revoke the license at any time.").

¶ 42　　Moreover, to the extent the Trust relies on an alleged promise made by Howe's predecessor to Winston, its claim fails for another reason.  Unlike an easement, a license is not a property right. *Hinsdale Cnty. Bd. of Equalization v. HDH P'ship*, 2019 CO 22, ¶ 43. It is instead a "personal privilege to do some act . . . upon the land of another not involving possession of an estate or interest therein." *Roaring Fork Club, LLC v. Pitkin Cnty. Bd. of Equalization*, 2013 COA 167, ¶ 41 (citation omitted).  Thus, even if *Winston* had an irrevocable license to use the driveway, that right was personal to

Winston and did not pass to the Trust with the title to the Trust Property. *See Radke v. Union Pac. R.R. Co.*, 334 P.2d 1077, 1087 (Colo. 1959) ("Ordinarily a license is not assignable by the licensee without the consent of the licensor . . . .").

## E.     Adverse Possession

¶ 43     The Trust contends that the district court erred by granting summary judgment on portions of its claim for adverse possession because (1) Howe did not move for summary judgment on that claim, and (2) the district court improperly divided the disputed area into individual components rather than considering the area as a whole. On this claim, we agree that the district court erred.

### 1.     Sua Sponte Summary Judgment

¶ 44     The Trust moved for summary judgment on its claim for adverse possession. Howe explicitly did not. To the contrary, Howe confirmed in his motion for partial summary judgment that the adverse possession claim was "not the subject of this Motion." The district court nevertheless granted summary judgment in favor of Howe and against the Trust as to portions of the disputed area. Under the circumstances of this case, we conclude this was error.

¶ 45    A district court is not categorically precluded from entering summary judgment sua sponte. *Marks v. Gessler*, 2013 COA 115, ¶ 52. But such a ruling is "unusual" and may be reversible error if the rights of the party against whom summary judgment is entered are not adequately protected. *ISG, LLC v. Ark. Valley Ditch Ass'n*, 120 P.3d 724, 730-31 (Colo. 2005). To protect the party that loses its claim, the district court "must provide an adequate opportunity to present legal argument and to assert contested facts that would render summary judgment inappropriate." *Id.* at 730.

¶ 46    The district court's ruling on the adverse possession claim did not afford the Trust this opportunity. That ruling was based primarily on arguments made in Howe's response to the Trust's summary judgment motion. None of those arguments were included in Howe's motion because Howe did not move for summary judgment on that claim. *See Wallman v. Kelley*, 976 P.2d 330, 332 (Colo. App. 1998) ("An issue not raised by the moving party in the [initial] motion or brief cannot serve as the basis for summary judgment because the non-moving party is not put on notice as to the need to present evidence concerning that issue.").

¶ 47 Although the Trust had the opportunity to respond to these arguments in its reply in support of its own motion, it was solely in the posture of asserting there was *not* a genuine issue of material fact rather than that there was. In that posture, it had no reason to "assert contested facts." *ISG*, 120 P.3d at 730. Instead, it had to show there were no such facts. Moreover, to the extent the Trust did attempt to contest the facts asserted in Howe's response through supplemental affidavits, the district court struck those affidavits as an attempt to raise new facts and arguments in a reply.

¶ 48 As one example, the district court granted summary judgment for Howe with respect to the goat shed based on a theory first raised in Howe's response — that even if the Trust's predecessors had adversely possessed the shed before 2003, Howe regained ownership by possessing it under the color of title and paying taxes on it since then. *See* § 38-41-108, C.R.S. 2024. The Trust urged the court not to consider this argument because it was not raised in Howe's pleadings. But because Howe had not moved for summary judgment on this basis, the Trust had no notice that it needed to present evidence to refute it. *See Wallman*, 976 P.2d at 332.

## 2. Division of Disputed Property

¶ 49     We also are not convinced that the district court's ruling was correct on the merits such that its procedural error was harmless. *See ISG*, 120 P.3d at 731 (affirming sua sponte dismissal where there were sufficient legal grounds for the dismissal); *Union Ins. Co. v. Hottenstein*, 83 P.3d 1196, 1203 (Colo. App. 2003) (holding that district court's error in prematurely granting summary judgment was harmless where that ruling was correct on the merits).

¶ 50     To obtain ownership of real property by adverse possession, a claimant must prove that their possession was "actual, adverse, hostile, under a claim of right, exclusive, and uninterrupted" for a period of eighteen years. *Trask v. Nozisko*, 134 P.3d 544, 549 (Colo. App. 2006); *see also* § 38–41–101(1), C.R.S. 2024.  When the boundaries of the land claimed by adverse possession are not established by fences or other barriers, the adverse possessor may claim only the land actually occupied. *Trask*, 134 P.3d at 549. Whether possession is hostile, actual, exclusive, and adverse is a question of fact. *Lensky v. DiDomenico*, 2016 COA 89, ¶ 22.

¶ 51     But actual occupancy does not require "constant, visible occupancy or physical improvements on every square foot of the

25

parcel claimed." *Smith v. Hayden*, 772 P.2d 47, 52 (Colo. 1989). Instead, the adverse possessor "need only act as the average landowner would in utilizing the land for the ordinary use of which it is capable." *Schuler v. Oldervik*, 143 P.3d 1197, 1203 (Colo. App. 2006). The nature of the property is therefore "critical" to what constitutes actual possession. *Smith*, 772 P.2d at 55. Any "actual visible means" that give notice of the exclusion of others and dominion over the property is sufficient. *Id.* at 52 (citation omitted).

¶ 52      Thus, multiple physical improvements on a single disputed parcel of property can prove actual occupancy of the entire parcel. *See id.* at 55 (holding that plaintiff's maintenance of a drainage ditch on the rear portion of property and use of the front portion "as a driveway, parking, picnic and play area" demonstrated actual occupancy of entire parcel); *Holland v. Sutherland*, 635 P.2d 926, 928 (Colo. App. 1981) (holding that "the existence of a small water spigot and a 24-30 inch high gas meter," together with the storage of equipment on the property, was sufficient to support a finding of actual possession); *cf. Concord Corp. v. Huff*, 355 P.2d 73, 76 (Colo. 1960) (holding that the erection of a TV antenna on a portion of a ten-acre pasture did not constitute possession of the property).

¶ 53    Here, the Trust asserted a claim of adverse possession of the entire "crescent moon shaped area" around the cabin, as depicted in the diagram attached to Yardley's affidavit.  Although the Trust described the area as containing several improvements — including the cabin, a goat shed, a propane tank, a well, and an outhouse — its motion made clear that its claim encompassed the entire area. The district court, however, separated each of the individual improvements from the land itself.  In doing so, it concluded that there was no genuine factual dispute that the Trust's predecessors had adversely possessed the propane tank and well but not the "crescent-shaped area" in which the propane tank and well were located or the goat shed that was also located within that area.

¶ 54    The district court's analysis effectively required the Trust to show "constant, visible occupancy or physical improvements on every square foot of the parcel claimed." *Smith*, 772 P.2d at 52.  For example, the court relied on *Trask*, 134 P.3d at 550, to conclude that Yardley's activities on the disputed area would not put the Howe Property owners on notice that Yardley was making use of the land.  But the court's rulings with respect to the propane tank and well undermine this conclusion.  The court also acknowledged the

27

evidence that the Trust's predecessors had used the goat shed from 1976 to 2003. The use of the propane tank, well, and goat shed created a genuine issue of material fact as to whether the Howe Property owners had notice that the Trust's predecessors were making use of at least some portion of the disputed land. *See id.*

¶ 55 We also disagree with the district court's conclusion that Yardley's affidavit did not establish a triable issue as to whether Howe and his predecessors had notice of Yardley's use of the disputed area. *See id.* at 549. Most significantly, Yardley built a shed on the area, which was later converted to a sleeping cabin and served as Yardley's son's home for more than ten years. *See id.* at 550 (noting that "the construction of a flower or vegetable garden and a protective fence . . . certainly would put the owners on notice of the use," and "plant[ing] irises and stack[ing] wood . . . might be sufficient"). Beyond that, Winston parked cars, stored property, and in addition to the propane tank, placed gas lines and water lines in the area. *See Smith*, 772 P.2d at 55. The primary issue in *Trask* was not that the claimed uses were insufficient to put the owners on notice; it was that the uses were either not on the

disputed property or not for the full statutory period. *See Trask,* 134 P.3d at 549-50. Neither of those elements is at issue here.

¶ 56 None of this means that by showing use of any portion of the land, however small, the Trust was necessarily entitled to all of it. *See Concord Corp.*, 355 P.2d at 77 ("The placing of a few improvements or structures is not a taking of possession thereof . . . ."). That is particularly true where, as the district court noted, the disputed area "appears to be arbitrarily designed to give [the Trust] certain required setbacks." *See Trask*, 134 P.3d at 550.

¶ 57 But the specific boundaries of the area that the Trust or its predecessors adversely possessed, if any, is itself a material factual dispute. Indeed, consistent with Howe's decision *not* to move for summary judgment on the adverse possession claim, he asserted in his response to the Trust's summary judgment motion that the location of the disputed property presented a factual dispute. We agree. Yardley's affidavit describing his use of the surrounding area his map outlining the area of use, and the district court's rulings as to the propane tank, well, and goat shed all raise a genuine issue of material fact as to (1) whether the Trust and its predecessors

29

adversely possessed the area surrounding the cabin; and (2) if so, the boundaries of the area they adversely possessed.

¶ 58 We therefore reverse the summary judgment against the Trust on its claim for adverse possession of the crescent-shaped area around the cabin, including the goat shed, and we remand for further proceedings on that claim. In doing so, we express no opinion on the merits of Howe's argument under section 38-41-108.

### III. Post-Summary Judgment Proceedings

¶ 59 The Trust makes various references throughout its brief to its motion to reconsider and its motion for post-trial relief under C.R.C.P. 59. But the Trust does not develop any argument concerning the denial of these motions independent of its arguments as to the summary judgment order. We therefore do not consider the district court's denial of the Trust's motion for reconsideration or its Rule 59 motion. *See Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12 ("We don't consider undeveloped and unsupported arguments."), *aff'd*, 2021 CO 56. As to the Trust's argument that the court should have more precisely defined the boundaries of the area adversely possessed, we have noted above that this issue presents a factual dispute.

¶ 60    The Trust also takes issue with the district court's demeanor during a brief hearing on what was supposed to be the first day of trial, four days after the summary judgment ruling. It asserts that the court's comments indicated bias. We disagree. We see nothing in the record to indicate that the court acted inappropriately. It simply made the eminently reasonable point that, if the Trust intended to move for reconsideration of the summary judgment ruling, it did not make sense to proceed to trial before that motion was filed. To the extent the Trust bases its claim of bias on the district court's rulings, that claim also fails. *See Schupper v. People*, 157 P.3d 516, 521 n.5 (Colo. 2007) ("[R]ulings of a judge, although erroneous, numerous and continuous, are not sufficient in themselves to show bias or prejudice.") (citation omitted).

## IV.    Disposition

¶ 61    The summary judgment on the Trust's adverse possession claim is reversed, and the case is remanded for further proceedings consistent with this opinion. The judgment is otherwise affirmed.

JUDGE FREYRE and JUDGE SULLIVAN concur.